ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
NOV - 5 2007
U.S. COURT OF FEDERAL CLAIMS

METCALF CONSTRUCTION COMPANY, INC. )
73-4273 Hulikoa Drive )
Kailua-Kona, Hawaii 96740 )

Plaintiff, )

v. ) Civil Action No.: 07-777 C

THE UNITED STATES OF AMERICA )

Defendant. )

# COMPLAINT

Plaintiff, Metcalf Construction Company, Inc., by the undersigned counsel, files this Complaint against the United States of America, and alleges as follows:

## PARTIES AND JURISDICTIONAL STATEMENT

1. Metcalf Construction Company, Inc. ("Metcalf") is a Hawaii Corporation with its principal place of business located at 73-4273 Hulikoa Drive, Kailua-Kona, HI 96740. MCCI is a small business engaged primarily in the construction trade as a general contractor.

2. Defendant, the United States of America, acting by and through the Department of the Navy (the "Navy"), a federal agency, is a body politic authorized by law to enter into contracts for the procurement of goods and services.

3. Jurisdiction is conferred by 28 U.S.C. § 1491.

4. This action is brought pursuant to the provisions of 41 U.S.C. § 609, and seeks a judgment for damages sustained by Plaintiff.

5. On March 30, 2007, Metcalf submitted its Global Certified Claim and Request for Final Decision of the Contracting Officer (the "Global Claim") pursuant to the Contract Disputes Act, codified at 41 U.S.C. § 601 *et seq*. Metcalf set forth two alternative theories of relief,

requesting the recovery of a sum certain for each. First, Metcalf claimed breach of contract and associated damages. Alternatively, Metcalf claimed damages pursuant to a "delay and impact" claim, including various direct and indirect costs, improper credits, the remission of liquidated damages, and the "pass-through" claims of its subcontractors.

6. Metcalf certified its Global Claim in accordance with 41 U.S.C. § 605(c)(1) and requested a Final Decision in accordance with 41 U.S.C. § 605(a).

7. Pursuant to 41 U.S.C. § 605(c), the Contracting Officer was required to take one of the following two actions within sixty (60) days after Metcalf submitted the Global Claim: (a) issue a final decision or (b) notify Metcalf "of the time within which a decision will be issued."

8. By letter dated May 29, 2007, the Navy acknowledged receipt of the Global Claim and stated in part as follows:

> Pursuant to the Contract Disputes Act and Federal Acquisition Regulation (FAR) 52.233-1, Disputes (Dec. 1998), Alternate I (Dec. 1991), notice is hereby given that a Final Decision by the Contracting Officer is expected to be issued on or before January 18, 2008. This date is subject to change based on your submission of a revised claim as noted in your letter Serial Letter 1908 dated May 23, 2007.
>
> * * *
>
> This notice serves only as acknowledging receipt of your global claim. Although we have offered an estimated date for issuance of a Contracting Officer's Final Decision, this letter is not warranting that the claim, as presented, is complete and proper for the purpose of rending a Final Decision. Should any matters arise during our review that requires your attention, you will be notified.

9. On October 4, 2007, Metcalf submitted certain revisions to its stated claim amounts in the Global Claim. In summary, Metcalf claimed a recovery in the amount of $26,089,139 on its breach of contract claim, and, in the alternative, a recovery in the amount of $17,250,124 on its delay and impact claim. The underlying basis of the Global Claim did not change.

10. In its transmittal letter dated October 4, 2007, Metcalf objected to the length of time the Navy was taking to issue a Final Decision in response to the Global Claim. In pertinent part, Metcalf stated as follows:

> In addition, we want to express one objection to the length of time the Navy is taking to respond to the Global Claim. When Lynn Wong, Contracting Officer, acknowledged receipt of Metcalf's Global Claim, she indicated that a Final Decision by the Contracting Officer "is expected to be issued on or before January 18, 2008." The Navy states no reasonable basis to take over six (6) months for the Contracting Officer to review the Global Claim and issue a Final Decision as it relates to Metcalf's entitlement, regardless of any quantum issues raised by the enclosed revisions. Accordingly, if Metcalf does not receive a Final Decision by December 1, 2007, we will consider the claim "deemed denied" and proceed with an appeal.

11. By letter to the Navy dated October 17, 2007, Metcalf followed up on the status of the Global Claim, stating in part:

> I am writing to follow up on our request that the Government issue a timely Final Decision in response to our Global Claim. On October 4, 2007, we submitted our revised damages to our Global Claim, which was submitted on March 30, 2007, and requested that the Government issue a Final Decision by December 1, 2007. We have not received a response to that request. Please let us know the Government's intentions concerning the Global Claim. I would appreciate a response by October 26, 2007.

12. The Contracting Officer has failed to inform Metcalf when a Final Decision will be issued, or furnish a fixed date or date certain on which a Final Decision will be issued, in response to the Global Claim.

13. The Contracting Officer has failed to issue a Final Decision within a reasonable time. Pursuant to 41 U.S.C. § 605(c)(5), the Contracting Officer's failure to issue a Final Decision in response to the Global Claim within a reasonable period constitutes a "deemed denial," authorizing the commencement of this lawsuit.



5/8147.1

## BACKGROUND FACTS

14. On or about December 31, 2002, Metcalf was awarded Contract N62742-02-C-1313 by the Navy to design and construct 212 new housing units on the Marine Corps Base Hawaii in Kaneohe Bay, Hawaii, on the island of Oahu (the "Contract"). The total original Contract price was $48,370,000.

15. Metcalf was awarded the Contract after Metcalf successfully protested its elimination from the competition under the Solicitation to the United States Court of Federal Claims in *Metcalf Construction Company v. United States,* 53 Fed. Cl. 617 (Fed Cl. 2002). In that decision, the Court found that Metcalf had met its heavy burden of showing by clear and convincing evidence that the Navy had failed to act in accordance with federal procurement law and regulation when it eliminated Metcalf from the competitive range for the stated basis. In addition, the Court found unfair and unequal treatment by the Navy, when one offeror was informed by the Navy of a defect in its proposed pricing and given the opportunity to correct, while Metcalf was eliminated from the competition based on the exact same defect without having the same notice or opportunity to correct. The Court also noted its curiosity with the Navy's notification to Metcalf of its elimination after the contract was awarded to Lend Lease Actus, a large business.

16. After award of the Contract, Metcalf commenced performance and substantially completed the Project on or about March 1, 2007.

## NAVY MALADMINISTRATION AND MISCONDUCT

17. Throughout performance of the Contract, Metcalf was subjected to numerous instances of bad faith conduct by Navy officials, which substantially increased Metcalf's costs and time of performance on the Project. The Navy's systematic actions and inaction, which

impeded Metcalf's efforts to execute its work in an efficient and timely manner, started soon after "Notice to Proceed" and continued through completion, causing Metcalf to expend considerable costs over and above the Contract price.

18. The universe of examples of Government misconduct is far too extensive to describe in full detail. Certain examples set forth below illustrate the Navy's misconduct, unreasonableness, and breaches of contractual obligations throughout Metcalf's performance.

**Example 1:**
**Contrary to the Approved Specifications, the Navy Required a SureTrak Schedule**

19. The approved specifications required Metcalf to develop and submit to the Navy a critical path method ("CPM") schedule known as the Baseline Network Analysis Schedule ("Baseline Schedule"). Metcalf was required to obtain the Navy's acceptance of its Baseline Schedule prior to commencing any permanent construction elements on the site. The Navy's acceptance of Metcalf's Baseline Schedule was a predecessor to the start of Metcalf's site work and building construction.

20. In accordance with ¶ 1.4 of Section 01321N (Network Analysis Schedules) of the approved specifications, which provides: "The scheduling software that will be utilized by the Government on this project is Microsoft Project 2000," Metcalf submitted its Baseline Schedule utilizing the required software in the late Summer of 2003.

21. The Navy rejected the submittal because its personnel apparently preferred Primavera SureTrak software, and demanded that Metcalf use it in lieu of the specified Microsoft Project. The Navy later expressed its position that the Naval Facilities Guide Specifications ("NFGS") requires the use of either Primavera SureTrak or Primavera Project Planner (P3) to develop project schedules and Metcalf's use of Microsoft Project was contrary to the NFGS.

22. The Navy's rejection of Metcalf's use of Microsoft Project was wrongful. The NFGS did not apply to schedule requirements.

23. Over Metcalf's objection, the Navy forced Metcalf to recreate its Baseline Schedule using SureTrak, which was a software system unfamiliar to Metcalf.

24. This change in software systems required Metcalf to incur additional costs to purchase the software, acquire technical training for its staff in the use of this system, and re-input the scheduling data into SureTrak, and it delayed the commencement of construction activities as well as the overall Project.

25. After approving the Baseline Schedule, the Navy continued to interfere with Metcalf's efforts to prosecute the work by repeatedly and unreasonably rejecting Metcalf's updated schedule submittals, even though they were submitted using the Navy's preferred software.

**Example 2:**
**The Navy Failed to Timely Investigate, and Then Unreasonably Rejected, Expansive Soils As a Differing Site Condition**

26. As part of the RFP, bidders were furnished a preliminary geotechnical investigation report issued by Hirata & Associates (hereinafter referred to as "the Hirata Report"). The Hirata Report, dated December 18, 2000, states that "[l]aboratory testing on the surface soil indicated a slight expansion potential." The Hirata Report recommended the use of conventional shallow foundations such as spread footings or thickened slab foundations to support proposed structures.

27. Prior to bidding, on or about April 27, 2001, the Navy informed all bidders that if the information in the Hirata Report differed from this independent geotechnical report, a change order would be issued:

> Q15: Page 2B-1, Para. 2B-1.c, Contractor Soil Investigation Report. This requires an independent investigation after award. The last two sentences state "submit in writing proposed or requested changes to the writing proposed or requested changes to the Government requirements with appropriate technical data. Changes are subject to approval by Contracting Officer." Should we infer from this that any unforeseen soil conditions or variances from the Government's soil report will be dealt with by change orders?
>
> Answer: Yes, if there's a major disparity from the Government's soil reconnaissance report.

28. Metcalf conducted the required site inspection at the location of the Project prior to bid and did not ascertain or discover any information that contradicted the conclusions and/or recommendations contained in the Hirata Report.

29. Metcalf based its bid price for the foundation and concrete slab design and construction on the information contained in the Hirata Report.

30. Pursuant to Part 2B.1 of the Technical Requirements of the Contract, the Contractor was required to provide an independent geotechnical report (separate from the Hirata Report) to ensure that geotechnical issues were addressed in the soil and foundation aspects of the design of the Project.

31. After award of the Contract, in accordance with Part 2B.1 of the Technical Requirements of the Contract, Metcalf engaged Geolabs, Inc. ("Geolabs") to prepare the required field exploration report. On or about May 7, 2003, Geolabs forwarded its recommendations to Metcalf. Geolabs reported that it had found clayey and silty soil that exhibited moderate to high expansion potential when subjected to moisture fluctuations. Geolabs noted that this finding differed significantly from the findings of slight expansion potential in the Hirata Report and that Hirata's recommendations for designs of slab-on-grade did not account for the potential of these soils for swelling. Given the expansive soils, Geolabs recommended capping the slab subgrade area with at least 600mm of non-expansive select granular fill and scarifying the soils below this

fill to a depth of about 200mm. Geolabs stated further that both the soils below the granular fill and the fill itself should be compacted to a minimum of 90% relative compaction.

32. On or about June 24, 2003, Metcalf forwarded to the Contracting Officer Geolabs' formal report dated June 20, 2003. (Geolabs Report #1). In that report, Geolabs set forth its findings and recommendations as initially laid out in its May 7, 2003 supplemental recommendations. Geolabs also noted that its findings, which were very different from those of Hirata which had been included in the RFP, could constitute a differing site condition. In its transmittal of the Report to the Navy, Metcalf requested an opportunity to discuss the apparent differing site condition pertaining to the expansive soils.

33. After receiving no substantive response from the Navy to its request to discuss the perceived differing site condition, on or about September 19, 2003, Metcalf forwarded to the Navy Request for Information ("RFI") #0008, setting forth the contradicting information contained in the Geolabs Report #1 and the Hirata Report with respect to the expansive nature of the soils. If the Hirata Report soil information and recommended foundations were erroneous, Metcalf informed the Navy that it would be necessary to excavate approximately 35,000 tons of existing expansive material to remedy the situation and replace it with non-expansive fill material.

34. On or about September 24, 2003, Metcalf submitted a proposal to the Navy to replace 2'0" of expansive soil material at the project site in the amount of $1,478,823 and requested a twenty-five (25) day time extension to the project schedule.

35. In response, the Navy informed Metcalf that it was Metcalf's burden to prove the existence of a differing site condition. Metcalf objected, contending that it is the Government's

responsibility under FAR 52.236-2(b) to investigate the existence or non-existence of a differing site condition "promptly" after receipt of notice of a differing site condition.

36. In furtherance of progress on the Project, Metcalf asked Geolabs to conduct a second investigation of the soil condition. Geolabs issued a report dated October 15, 2003 (Geolabs Report #2), which was transmitted to the Navy on or about October 27, 2003. Geolabs reported once again that the silty and clayey soils encountered at the site exhibited a moderate to high potential for shrinking and swelling when subjected to moisture fluctuations. Based on these subsurface conditions, and the relatively light structural loads anticipated for the building structures, Geolabs recommended a shallow foundation system consisting of spread and/or continuous footings to support the new housing structures. Consistent with its earlier recommendations that were incorporated into the design, Geolabs also recommended that the silty and clayey subgrade soils be properly prepared and capped with a 600-mm layer of non-expansive select granular fill materials to reduce the potential for future distress to the lightly loaded slabs-on-grade resulting from shrinking and swelling of the silty and clayey soils. The non-expansive select granular fill (600 mm thick), as noted in the Geolabs Report #2, was required to be compacted to a minimum rate of 90% relative compaction.

37. While Hirata and Geolabs recommended the same foundation (i.e. a shallow foundation system consisting of spread and/or continuous footings) to support the new housing structures, the reports differed vastly on the preparatory work underneath the concrete slab/foundation due to the difference in classification of the soil. Hirata characterized the soil as non-expansive, requiring very little groundwork before installation of the slab and foundation. Geolabs found the soil to be expansive, requiring substantial ground preparatory work before

installation of the slab and foundation. This difference is significant in terms of cost of the work and time of performance.

38. Geolabs' recommendations for dealing with the expansive soils was specifically incorporated into Metcalf's design for the foundations underlying the buildings. The "Approved for Construction" set of drawings for the Building Design specifically incorporates Geolabs' recommendations. Drawing S1.0, Sheet 37 of 94, lists several structural notes, including Note 2.1 which is entitled: "Soil data per Geolabs, Inc. Soils Report W.O. 5022-00 recommendations dated May 7, 2003." The Note states:

> Soil beginning @ continuous spread footings = 2000 psf. Active and passive pressures are 40 psf and 300 psf respectively. Soils engineer to verify actual soils encountered during grading and excavation are consistent with the Soils Report and the subgrade is prepared such that shrink/swell potentials reduced per the report recommendations.

39. Drawing S5.0, sheet 57 of 94, which provides foundation details, also references the Soils Report of Geolabs in Detail 1 (lower left corner of drawing sheet). That detail references the "Soil Report" in four different notes, including: "See Arch and Soil Report for subgrade requirements (TYP)" and "See Soil Report recommendations for select granular fill req'ments for reducing shrink/swell potential (TYP)." The design submitted by Metcalf and approved by the Navy on or about November 19, 2003 appropriately addressed the expansive soils discovered on the Project and was ready to be followed.

40. On or about November 25, 2003, a meeting was held between Metcalf and the Navy to discuss the conflicting findings contained in the Hirata and Geolabs Reports. During this meeting, the Navy rejected the finding of Geolabs on the basis that it did not believe the surveys were correctly performed. Principally, the Navy disagreed with Geolabs' method of analysis based upon a new report solicited by the Navy from Hirata dated November 13, 2003. In that Report, Hirata opined that the soils encountered by Geolabs were similar to that

encountered by Hirata, but the classification difference (i.e., expansive versus non-expansive) resulted from different testing methods.

41. The Navy's rejection of Geolabs' findings forced Metcalf to conduct an additional investigation to demonstrate the existence of the differing site condition. In December of 2003, Metcalf engaged Weidig Geoanalysts to review the geotechnical reports issued by Hirata and Geolabs, conduct shrink-swell tests on additional soil samples, and provide an engineering analysis of this information. Weidig issued its report on or about January 21, 2004 and confirmed Geolabs' findings that the soils at the Project site were highly expansive. Weidig's report was furnished to the Navy by Metcalf.

42. On or about January 28, 2004 during the weekly CQC Meeting, Metcalf informed the Navy of its intention to proceed with the concrete slab/foundation work for the prototype units in accordance with Metcalf's approved design and its proposal dated September 24, 2003 (i.e., Metcalf would perform the necessary preparatory ground work caused by the expansiveness of the soil). The Navy made no objection to Metcalf's stated intent at that time.

43. On or about January 30, 2004, Metcalf again advised the Contracting Officer that it considered the expansive soils to be a differing site condition and that it would incur additional costs for the construction of the slab on grade and would require additional time to complete the Project.

44. Metcalf proceeded to perform the necessary work in accordance with the approved design for the concrete slab work. In accordance with that design, Metcalf compacted the expansive soils to a compaction rate of 90% as had been recommended by Geolabs. However, the Navy rejected the work and insisted that Metcalf follow the specification for non-expansive soil which required a compaction rate of 95%.

45. On or about February 12, 2004, Metcalf forwarded to the Navy by e-mail a letter from the Architect supporting Metcalf's position that the 90% compaction rate applied pursuant to the Geolabs report and the approved design.

46. On or about February 20, 2004, the Navy issued Non-Compliance #2 asserting Metcalf's compaction rate of the subgrade for building pads #60 and #61 was below 95%. The Navy further directed Metcalf to proceed in accordance with the specification governing the non-expansive soils and threatened default if Metcalf failed to follow the Navy's direction.

47. On or about March 8, 2004, Metcalf responded to the Navy's Non-Compliance Notice. Metcalf pointed out the Navy's failure to acknowledge the overwhelming evidence of the existence of a differing site condition. Metcalf also explained the "Catch 22" position the Navy was placing it in by directing it to proceed with a specification that was not applicable, and if followed, would place Metcalf in jeopardy of slab failures given its responsibility for the design. Metcalf also placed the Navy on notice of the critical delay to Contract completion by the Navy's failure to promptly investigate the differing site condition, to timely provide direction to proceed, and to meet to discuss the issue.

48. During weekly meetings thereafter, Metcalf repeatedly requested direction from the Navy on the status of resolving this issue and continued to complain of delay to critical path work. In response, the Navy did relatively nothing to address the issue.

49. After Metcalf made inquiries to numerous Navy offices to review this matter, the Navy scheduled a meeting for April 26, 2004. In advance of the meeting, on or about April 19, 2004, Metcalf, solely to appease the Navy and to allow the work to continue, forwarded to the Navy a revised specification that covered procedures for both expansive and non-expansive soil conditions to mitigate the ongoing delay.

50. After the meeting was held on or about April 26th, the parties agreed to proceed with respect to the differing site condition issue as follows:

1. The Government will issue a modification to MCCI to build the two prototype buildings in accordance with Geolabs recommendations to remove 2 feet of the expansive soils. ROICC will issue a formal Request for Proposal as soon as funding is secured from the PACDIV Project Manager. MCCI may go ahead and submit an unsolicited proposal for this work. PACDIV is expecting a cost proposal for work **only** to build the prototypes. Time will not be provided yet for this effort.

2. Geolabs will propose a revised sampling and testing protocol this week which will include a proposed number of and location for samples, and a suite of tests consisting of UBC Expansive Index, Plasticity Index, and Ring-Swell tests in order to drive some rough correlations. PACDIV will review these recommendations and then ROICC MCBH will issue a modification to MCCI for Geolabs to perform this additional testing. Approximately 10 to 12 additional borings were discussed. Based on the findings from these test results, both parties will meet again to come up with a conclusion on how to then proceed.

51. Although agreements were reached between the parties at the April 26, 2004 meeting, delays to the Project completion continued thereafter because the Navy failed to timely issue a modification and/or notice to proceed with the prototypes.

52. On or about June 10, 2004, in an attempt to mitigate the delays to project completion, Metcalf advised the Navy that it was going to commence construction of the prototype pads in accordance with the approved design, regardless of the Navy's failure to issue the promised modification.

53. On or about June 22, 2004, the Contracting Officer advised Metcalf that it would not be responsible for any work performed by Metcalf in advance of a contract modification.

54. Despite suspicion and consternation arising from the Navy's conduct, Metcalf elected to proceed with the work on the prototypes as well as the production units at its own expense, believing that the Navy would ultimately issue a Modification. Metcalf elected to proceed with the work, despite not having Navy approval, to generate revenue to cover overhead

and allow follow-on trades to commence work. Ultimately, Metcalf took out loans to finance this additional work.

55. By letter dated July 1, 2004, Metcalf complained of the Navy's failure to render a decision with respect to the differing site condition claim for more than a year after notice of the same. The Navy could have avoided delays to project completion had it confirmed the changed condition, offered an option, or denied the claim several months earlier.

56. Meanwhile, evidence of the existence of a differing site condition continued to accumulate. By letter dated July 15, 2004, Metcalf transmitted to the Navy the results of the additional testing conducted by Geolabs. This additional testing supported earlier findings that the soils at the site had significant expansion potential.

57. To further buttress this position, Metcalf hired yet a third soils engineer, Stewart Engineering, which also agreed with Geolabs that the tests displayed moderately to highly expansive soil. Stewart Engineering expressly disagreed with the finding of Hirata that the soil was only slightly expansive.

58. By letter dated August 5, 2004, the Navy denied the existence of a differing site condition with respect to the expansiveness of the soil.

59. Although the Navy denied the existence of a differing site condition, on or about August 17, 2004, the Navy issued Modification No. A00007 to the Contract due to the differing site condition to compensate Metcalf for the additional costs associated with construction of the prototype building pads and to extend the Contract completion date by five (5) days.

60. After receipt of notice that its differing site condition claim was rejected, Metcalf opted to change the design of the slabs to post-tension concrete to mitigate delays. While post-

tension concrete costs more than pouring the conventional slabs, Metcalf was able to avoid the additional time and cost of excavating and importing fill to remedy the differing site condition.

**Example 3:**
**The Navy Downplayed Chlordane and then Gave Metcalf Conflicting Directives**

61. Chlordane is a chemical used in earlier times to treat homes for termite infestation. It was banned by the EPA in 1988 and classified as a Group 2 human carcinogen by international agencies.

62. Metcalf reasonably did not include in its bid proposal any funds for remediation or other corrective action for chlordane contamination. In pertinent part, the Request for Proposal states at Part 2, p. 2A-4, paragraph 23: "Chlordane is present in the soils around the building foundation. Remediation actions are not required since the levels are acceptable." Additionally, the RFP included a Site Engineering Investigation Report ("SEI"), which indicated that chlordane was "undetected" in the soil samples.

63. Further, Notice No. 3 attached to the RFP stated as follows:

> Q34: Does the Navy have any requirements for removal of the chlordane contaminated soil? For example, if homes are built over the contaminated area or [sic] will the Navy require removal of the Chlordane
>
> Answer: No remediation action of the Chlordane contaminated soil is required per Part 2, page 2A-4, paragraph 23.

64. Although the Contract indicated undetectable levels of chlordane, the SEI recommended that the remaining residential units not previously assessed as part of its survey be tested for chlordane. Subsequently, Metcalf performed two (2) surveys and found, consistent with the SEI report, that there was no detectable chlordane. First, in September 2003, Metcalf's subcontractor, The Environmental Company ("TEC"), took additional sampling of soils, and documented in its report dated September 26, 2003 that it had found no detectable chlordane.

Then, in November 2003, Metcalf conducted another site survey and laboratory analysis and again found no detectable chlordane.

65. In June 2005, almost two years after Metcalf's November 2003 survey, the Navy requested that Metcalf conduct additional chlordane soil sampling on the native topsoil that was being processed on the site. Upon information and belief, the Navy knew of the chlordane problem months before requesting this test but purposely did not reveal this information to Metcalf. The Navy had no alternative but to bring the matter to Metcalf's attention by ordering the tests when chlordane was discovered at an adjacent jobsite at the military base.

66. The Navy issued Modification A00014, which included additional funds of $7,890.00, and directed Metcalf to proceed with the additional sampling. In late July 2005, the first set of samples revealed chlordane contamination in excess of the EPA's Preliminary Remediation Guidelines (PRG) of 1.6 parts per million (ppm).

67. Initially, the Navy appeared to be indifferent to the discovery of chlordane. Metcalf received conflicting direction regarding how to deal with the chlordane contaminated soils, both with respect to direction from the Navy and from the Contract Specifications themselves. Further complicating the matter is the guidance from the State of Hawaii's Department of Health ("DOH").

68. In April 14, 2003, long before any chlordane contaminated soils had been discovered, the Navy, through George Lingle of the MCBH Environmental Department, informed Metcalf that *any* detectable level of chlordane must be either capped under a slab or asphalt or buried under six inches of non-contaminated soil. Mr. Lingle noted that the State's limit is 1.6 mg/kg, but stated that "[l]evels below this [figure] does *not* mean the soil is cleared for unregulated use."

69. Conflicting with Mr. Lingle's direction, Section 02095, Paragraph 1.20.1 of the Contract Specifications provides that the Contractor must "[d]ispose of off-site, cover with 150 mm of clean topsoil or reuse under building concrete slabs, soil with chlordane content of 1.6 ppm or greater." In other words, the Contractor is *unrestricted* in its use of chlordane-contaminated soils of *less* than 1.6 ppm but must manage contaminated soils above this level.

70. On or about August 1, 2005, the Navy directed Metcalf to follow Section 02095 of the Contract Specifications, which conflicted with the Navy's April 2003 direction.

71. In August 2005, in response to Metcalf's RFI 0059, which sought clarification regarding the conflicting direction, the Navy directed Metcalf to refer the matter to its environmental consultant because of Metcalf's design-build responsibilities.

72. By letter to the Navy dated August 22, 2005, the DOH stated that no action is required for chlordane levels of 1.6 mg/kg or less. However, where the chlordane is in the range of 1.6 mg/kg to < 6.5 mg/kg, the area can remain if it is covered with 18" of clean topsoil. If it is 6.5 mg/kg or greater, the material can be reused but must be capped, i.e., placed under roadways, sidewalks, driveways, etc.

73. In September 2005, Metcalf developed and submitted for review a chlordane management plan that is consistent with the DOH guidelines and provides as follows: (a) chlordane contaminated soils less than 1.6 ppm may be left in place for unrestricted use; (b) chlordane contaminated soils at least 1.6 ppm may be reused under concrete slabs and other hardened surfaces; (c) chlordane contaminated soils at least 1.6 ppm in exposed (not capped) areas must be removed from site (or reused).

74. In October 2005, the Navy directed Metcalf to revise its chlordane management plan such that chlordane contaminated soil between 1.6 ppm to 16 ppm may be used. In

addition, chlordane contaminated soil over 16 ppm may also be used but under a "barrier" ("to be determined later"). This direction is inconsistent with the more strict DOH guidelines.

75. The Navy also directed Metcalf to leave contaminated soil in place and plant landscaping in the contaminated soil.

76. In recognition that chlordane constituted a differing site condition, the Navy issued a series of Contract Modifications to partially compensate Metcalf, in terms of both Contract time and additional money, for having to handle and dispose of chlordane-contaminated soils. Those modifications did not fully compensate Metcalf for delays and additional costs incurred by Metcalf to deal with the chlordane problem.

**Other Examples**

77. Various other examples of Navy misconduct and interferences are set forth in detail in Metcalf's Global Claim. In summary, these examples include, but are not limited to, the Navy interfering with contemplated design revisions; interfering with Metcalf's construction means and methods; overcomplicating certain simple repairs; overinspecting the work; hassling subcontractors concerning performance qualifications; misinterpreting provisions of the Contract and applicable industry codes; providing untimely notice of baseless concerns about work already in place; arbitrarily rejecting submittals; inconsistently administering the payment process; enforcing in an abusive manner the safety program employed by Metcalf; and actively interfering with Metcalf's efforts to complete and turn over housing units.

78. The Navy's misconduct toward Metcalf under the Contract continued during the maintenance portion of the Contract after Metcalf submitted its Global Claim. On or about May 1, 2007, Metcalf received notice from Mark O. Wilkoff, the Suspending and Debarring Official for the Navy ("SDO"), that a debarment action had been initiated against Metcalf and Terry

Metcalf. The subject of the debarment action was a Request for Equitable Adjustment ("REA") that Metcalf submitted to the Navy on or about September 20, 2006, for Metcalf's additional costs for handling and disposing of chlordane-contaminated soil in excess of amounts granted by the Navy in Unilateral Modifications A00016 and A00017.

79. Metcalf responded to the proposed debarment, providing specific legal and factual reasons as to why the debarment was unfounded and unjustified.

80. On or about September 10, 2007, without warning, Metcalf received a letter dated September 4, 2007, setting forth the SDO's decision to debar Metcalf and Terry Metcalf through October 31, 2008 based upon the unfounded belief that Metcalf's submission of an REA which contained duplicated costs amounted to fraud.

81. Metcalf and Terry Metcalf filed a lawsuit in the United States District Court for the District of Columbia, seeking: a temporary restraining order and preliminary and permanent injunction against enforcement of the Navy's September 4, 2007 debarment notice; the termination of the Navy's debarment *ab initio*; and the award of reasonable attorneys' fees and costs expended as a result of the proceeding.

82. On Friday, October 12, 2007, the Court held a hearing on Metcalf's motion for a temporary restraining order. During the hearing, the federal district judge described the debarment proceeding as "shameful," and stated that she was "astonished" by the Navy's conduct in connection with the debarment proceeding. She questioned how the Navy could conclude fraud based upon apparent mistakes without a hearing. The Judge also advised the Navy that she considered the debarment "arbitrary and capricious."

83. By letter dated October 15, 2007, the Monday following the Friday hearing, the Navy unilaterally rescinded the debarment decision of September 4, 2007 and removed Mr. Metcalf and Metcalf from the Excluded Parties List System.

**COUNT I**
**(Breach of Contract / Breach of Duty of Good Faith and Fair Dealing)**

84. Paragraphs 1 through 83 of this Complaint are incorporated in this Count by reference as if fully set forth herein.

85. In December 2002, Metcalf was awarded Contract N62742-02-C-1313 by the Navy to design and construct 212 new housing units on the Marine Corps Base Hawaii in Kaneohe Bay.

86. Metcalf performed all the terms and conditions required of it under the Contract or is excused from said performance by the Navy's breaches of the Contract or by other acts or omissions of the Navy.

87. The Navy breached the Contract by numerous and repeated acts and omissions, such that Metcalf cannot be compensated adequately under the remedial provisions in the Contract.

88. From the beginning of the Contract through Contract performance, the Navy's administration of the Contract was marked by interference and hindrances, including but not limited to: failure to promptly investigate conditions which Metcalf identified as differing site conditions despite receiving notice of same from Metcalf; failure to recognize and compensate Metcalf for differing site conditions; meddling in Metcalf's design and design revisions despite Metcalf's role and responsibilities as the design-build contractor; inspection of Metcalf's work in an overzealous manner; withholding payments due and owed as a negotiating tool; wrongfully



5/8147.1

rejecting proposed personnel; and numerous other active interferences with Metcalf's efforts to perform the work required by the Contract.

89. Upon information and belief, the Navy's actions and inaction in administering the Contract, including but not limited to proposing Metcalf for debarment, were driven by "animus" or specific intent to harm, and were deliberately employed to delay Metcalf and/or increase Metcalf's costs in prosecuting the work and to hinder Metcalf's efforts to prosecute its claims under the Contract.

90. At a minimum, the Navy's actions and inaction in administering the Contract and related conduct were marked by subterfuges and evasions, and caused delay and hindrance to Contract performance by Metcalf.

91. Given these facts, the Navy's conduct was not only wrongful, but irrational and in bad faith.

92. As a direct and proximate result of the material breaches of the Contract by the Navy and the Navy's breach of the duty of good faith and fair dealing, Metcalf incurred costs far in excess of the amount Metcalf reasonably anticipated to perform the Contract.

93. On March 30, 2007, Metcalf submitted its Global Claim to the Contracting Officer, which set forth two alternative theories of relief. One of these theories was a breach of contract claim. On October 4, 2007, Metcalf submitted certain revisions to certain stated damage items in the Global Claim. Metcalf's breach of contract claim as submitted to the Contracting Officer was in the amount of $26,089,139.

94. The Contracting Officer failed to issue a timely decision in response to Metcalf's Global Claim, resulting in a "deemed denial" of same.

95. By its misconduct in administering the Contract, the Navy breached the Contract and breached the duty of good faith and fair dealing, which actually and proximately caused Metcalf to suffer damages in the amount of $26,089,139.

## COUNT II
**(Delay and Impact Claim)**

96. Paragraphs 1 through 83 of this Complaint are incorporated in this Count by reference as if fully set forth herein.

97. In December 2002, Metcalf was awarded Contract N62742-02-C-1313 by the Navy to design and construct 212 new housing units on the Marine Corps Base Hawaii in Kaneohe Bay.

98. The Contract incorporated by reference various standard clauses, including FAR 52.236-2 "Differing Site Conditions (APR 1984)," which provides in part as follows:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of --
>
> (1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or
>
> (2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
>
> (b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

99. The Contract also incorporated by reference FAR 52.243-4 "Changes (AUG 1987)," which provides in part as follows:

> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause[.]
>
> * * *
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.

100. The Contract also incorporated by reference FAR 52.242-14 "Suspension of Work (APR 1984)," which provides in part as follows:

> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted
>
> > (1) by an act of the Contracting Officer in the administration of this contract, or
> >
> > (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified),
>
> an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

101. During Contract performance, Metcalf encountered site conditions that materially differed from those indicated in the Contract, including but not limited to expansive soils and chlordane-contaminated soils, which caused an increase in Metcalf's cost of, and time required for, performing portions of the work under the Contract.

102. Also during Contract performance, through direction, instruction, interpretation, and/or determination, the Navy caused changes to the Contract, which caused an increase in

Metcalf's cost of, and the time required for, the performance of portions of the work under the Contract.

103. Also during Contract performance, the performance of portions of the work was suspended, delayed, or interrupted for an unreasonable period of time due to acts and failures to act by the Contracting Officer.

104. Various changes, differing site conditions, interferences, disruptions, and delays for which the Navy is responsible caused Metcalf to incur substantial additional costs, including but not limited to direct costs relating to new scheduling software, expansive soils, chlordane-contaminated soils, and administrative costs.

105. Additionally, the Navy improperly took a credit for Metcalf's installation of roofing tiles without wood battens.

106. Various changes, differing site conditions, interferences, disruptions, and delays for which the Navy is responsible also caused delay to the Contract completion date, which under the Contract was initially established as April 16, 2005.

107. During Contract performance, the Navy issued change orders which adjusted the Contract price and the Contract completion date. Through these change orders, the Navy recognized an adjusted Contract completion date of October 17, 2006.

108. Due to various delays for which the Navy is responsible, including but not limited to the Navy's improper rejection of Metcalf's Baseline Schedule and the Navy's failure to investigate and respond to Metcalf's notice of a differing site condition involving expansive soils, the Contract was not substantially completed until on or about March 1, 2007.

109. Also due to various delays for which the Navy is responsible, Metcalf incurred increased costs, including but not limited to extended field overhead, extended home office overhead, and premiums for extended builder's risk insurance.

110. Despite the various delays for which the Navy is responsible, and which should result in extensions to the Contract completion date beyond the date that Metcalf substantially completed the Contract, the Navy improperly withheld liquidated damages from Metcalf.

111. Additionally, the various changes, differing site conditions, and delays for which the Navy is responsible caused subcontractors of Metcalf to incur substantial costs, and Metcalf is "passing through" those claims to the Navy.

112. On March 30, 2007, Metcalf submitted its Global Claim to the Contracting Officer, which set forth two alternative theories of relief. One of these theories was a "delay and impact" claim. On October 4, 2007, Metcalf submitted certain revisions to certain stated damage items in the Global Claim. Metcalf's delay and impact claim as submitted to the Contracting Officer was in the amount of $17,250,124.

113. The Contracting Officer failed to issue a timely decision in response to Metcalf's Global Claim, resulting in a "deemed denial" of same.

114. By causing delays, disruptions, and interferences on the Project, the Navy constructively changed the Contract, entitling Metcalf, pursuant to the Changes, Differing Site Conditions, and Suspension of Work clauses, to an increase of the Contract price in the amount of $17,250,124, and an extension of the Contract completion date to a date beyond Metcalf's substantial completion of the Contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests alternatively:

A. That the Court find that the Navy breached the Contract and/or breached the duty of good faith and fair dealing, and enter judgment in favor of Plaintiff and against The United States awarding Plaintiff damages in an amount no less than Twenty-Six Million Eighty-Nine Thousand One Hundred Thirty-Nine Dollars ($26,089,139), plus interest, costs, and other such relief as the Court may deem appropriate; or, in the alternative,

B. That the Court find that Plaintiff's delay and impact claim is justified and warranted, that Plaintiff is owed the amount requested and that Plaintiff is entitled to a time extension beyond March 1, 2007, and enter judgment in favor of Plaintiff and against The United States awarding damages in an amount no less than Seventeen Million Two Hundred Fifty Thousand One Hundred Twenty-Four Dollars ($17,250,124), plus interest, costs, and other such relief as the Court may deem appropriate.

Dated: November 5, 2007

Robert J. Symon by [signature]

ROBERT J. SYMON
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C. 20036
Ph: (202) 393-7150
Fax: (202) 347-1684

Counsel for Plaintiff
METCALF CONSTRUCTION
COMPANY, INC.

Of Counsel:

ERIC A. FRECHTEL
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C. 20036
(202) 393-7150