# In the United States Court of Federal Claims

No. 07-777C
Filed Under Seal: November 30, 2011
Re-Issued For Publication: December 9, 2011[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| METCALF CONSTRUCTION CO., INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Breach of Contract; <br> Breach of the Duty of Good Faith and Fair Dealing; <br> Cardinal Change; <br> Contract Disputes Act, 41 U.S.C. §§ 601-13 (2006); <br> Federal Acquisition Regulations: <br> 52.236-2 ("Differing Site Conditions"); <br> 52.236-5(a) (prohibiting the requirement of "materials" by trade name); <br> Implied Consent That An Issue Was Tried; <br> Standing; <br> RCFC 15(b)(2), Motion To Amend Complaint. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Robert J. Symon**, Bradley Arant Boult Cummings LLP, Washington, D.C., Counsel for Plaintiff.

**Dawn E. Goodman, David Samuel Silverbrand, Kenneth M. Dintzer, Russell J. Upton,** United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Katherine A. O'Neill**, Department of the Navy, Office of the General Counsel, Of Counsel for Defendant.

## MEMORANDUM OPINION AND ORDER

**BRADEN, *Judge*.**

Metcalf Construction Co., Inc. ("Metcalf") was a successful contractor in the private sector when it commenced performance on its first federal housing contract on December 31, 2002. Metcalf, however, did not appreciate that, although this was a "design-build housing

---

[1] On November 30, 2011, the court forwarded a sealed copy of this Memorandum Opinion and Order to the parties to delete any information considered to be confidential and/or privileged, note any editorial errors requiring correction. The court has incorporated those comments, and corrected, or clarified certain portions herein.

project," the United States Department of the Navy ("the Navy") would require strict adherence to contractual requirements, instead of deferring to Metcalf's private sector expertise.

The reasons why this housing project required thirty-two contract modifications, extending the initial completion date from March 5, 2005 to March 2, 2007, and whether Metcalf or the Navy was responsible for the attendant costs of delay are the primary subjects of this case.

I.    **BACKGROUND.**[2]

    **A.    On April 5, 2001, The Navy Issued A Request For Proposal, But Subsequent Bid Protests Delayed A Contract Award.**

On April 5, 2001, the Navy issued Request for Proposal No. N62742-00-R-1345 ("RFP") for the demolition of existing housing at the Marine Corps Base, located on the island of Oahu, Hawaii at Kaneohe Bay and the design and construction of 212 new family duplex housing units (the "212 Project"). JX A1 at DEF0498333. The RFP divided the 212 Project into three parts: a base scope FY01 Project H-570 for 30 units, *i.e.*, Item 0001; "Option 0001"-FY02 Project H-571 for 158 units; and "Option 0002"-FY03 Projects H-571 and H-563 for an additional 24 units. JX A1 at DEF0498333.

On or about May 24, 2001, Metcalf, a Historically Underutilized Business Zone contractor, submitted an initial proposal. *See Metcalf Constr. Co., Inc.* v. *United States*, 53 Fed. Cl. 617, 620 (2002) ("*Metcalf I*")). On September 28, 2001, a contract was awarded to another bidder. *Id.* at 620-21. Metcalf requested a debriefing at which Metcalf learned that it was eliminated from consideration, because Metcalf's proposal exceeded the "budget ceiling" for Option 0002. *Id.* at 621.

On October 5, 2001, Metcalf filed a protest with the U.S. General Accounting Office ("the GAO") that subsequently was denied. *Id.* On January 18, 2002, Metcalf filed a bid protest in the United States Court of Federal Claims. *Id.* On July 2, 2002, the court determined that "[t]he bidders were treated unequally, thus unfairly, when one bidder received *unequivocal* clarification regarding the 'budget ceilings' and the other bidders did not[.]" *Id.* at 646. The court enjoined the Navy and the awardee from proceeding and ordered the Navy to reinstate Metcalf in the competitive range, amend the RFP, and instruct all offerors to resubmit final proposals. *Id.*

---

[2] The background and other relevant facts cited herein were derived from trial proceedings (TR 1-2630). The witnesses who testified on behalf of Metcalf's case-in-chief are listed, together with their job descriptions, in Court Exhibit A, attached hereto. The witnesses who appeared on behalf of the Government's case-in-chief are listed, together with their job descriptions, in Court Exhibit B, also attached hereto.

**B.      On July 17, 2002, The Navy Issued A Revised Request For Proposals And On October 22, 2002, Awarded A Contract To Plaintiff.**

On July 17, 2002, the Navy issued a revised RFP with Amendment No. 0011 that proposed a new scope of work, *i.e.*, combining "Item 0001" for Projects H-570 FY01 and Project H-571 FY02 with a total of 188 units ("Base Item") and "Item 0002" FY03 Project H-571 and H-563 with a total of 24 units.   JX B11 at DEF0063517-18.   Two additional amendments followed on July 22, 2002 and July 24, 2002.   JX B12 at DEF0063513-14; JX B13 at DEF0063509-11.[3]

On July 26, 2002, Metcalf submitted a final revised proposal of $42,971,000 for Item 0001, *i.e.*, the 188 unit Base Item, and $5,399,000 for Item 0002, *i.e.*, the additional 24 units.   JX D1 at DEF0063488-90.   On October 22, 2002, the Navy awarded Metcalf Contract No. N62742-02-C-1313 for the 188 unit Base Item ("the Contract").[4]   PX 54; JX D1 at DEF0063488-89.   In accordance with the RFP, the Notice to Proceed ("NTP") should have issued to Metcalf thirty days after the award date, *i.e.*, by November 21, 2002.   JX A1 at DEF0498370 (Solicitation Section 1D.1.a(a)).   Instead, on November 19, 2002, two days before the NTP was to issue, the Navy advised Metcalf of another GAO protest and directed Metcalf to "suspend any action," because a bid protest was filed by another firm.  PX 55.

**C.      On December 31, 2002, Plaintiff Continued Performance, But Thirty-Two Modifications, Extended The Initial March 5, 2005 Completion Date To October 17, 2006.**

On December 31, 2002, the Navy advised Metcalf to "continue performance" of the October 22, 2002 Contract, to be completed on or before March 5, 2005.  PX 58.  On January 29, 2003, the October 22, 2002 Contract was first modified to extend the completion date to April 16, 2005.  JX E1 at DEF0064202; *see also* Court Exhibit C, attached hereto.

---

[3]  The July 22, 2002 amendment changed the date of receipt for revised and final proposals and schedule for designing the units.  JX B12 at DEF0063514.  The July 24, 2002 amendment extended the time during which the Navy could exercise an option to build additional units and the timeline for building the entire project from 320 to 835 days.  JX 13 at DEF0063510.

[4]  The October 22, 2002 award was signed by the CO for Solicitation No. N62742-00-R-1345, referring to Contract No. N62742-00-C-1345.  JX D1 at DEF0063488-89.  All subsequent correspondence, documentation, and amendments, however, refer to Contract No. N6742-02-C-1313.  *See, e.g.,* JX E1-34 ("Amendment of Solicitation/ Modification of Contract" documents all reference Contract No. N6742-02-C-1313); PX 54 (Facsimile stating "re: N62742-02-C-1313, Award" and the header of the transmitted letter reads "SUBJECT: CONTRACT N62742-02-C-1313."  Although the parties did not identify or explain this discrepancy it appears that the change in contract number occurred as a result of Modification A0001, issued on October 22, 2002—the same day as the contract award.  JX E4 at DEF0064185-86.

On February 13, 2003, the Navy exercised Option 0001, adding twenty-four new housing units for a total of 212 units and increasing the price by $5,399,000 for a total of $48,370,000, but required that Option 0001's completion date be the same as the modified completion date of April 16, 2005 for the Base Item.  JX E2 at DEF0064203-04.  Thereafter, the Navy issued an additional thirty-one modifications,[5] eleven of which extended the completion date by an additional 549 calendar days, i.e., until October 17, 2006.[6]  JX E26 at DEF0064694.  In addition, the price was increased by 3.3%, or $1,577,872, for a final total price of $49,947,872.  JX E32 at DEF0542523.

### D.     Plaintiff, However, Did Not Complete Performance Until March 2, 2007.

Metcalf, however, did not complete performance on the last unit of housing until March 2, 2007, i.e., 136 days after the October 17, 2006 final extended completion date.  PX 455 (listing 3/2/2007 as the final acceptance date for Buildings 60, 61, and 65).  A variety of reasons that have been proffered by the parties to explain why the 212 Project was not completed until March 2, 2007 are discussed herein in detail.

The Contract originally was awarded for $42,971,000.  JX D1 at DEF0063488.  When the Navy exercised Option 0001, the Navy increased the price by $5,399,000 to a total of $48,370,000.  JX E2 at DEF0064203-04.  Several of the Navy's modifications to the Contract included award increases, JX E5-32,[7] for a final contract price of $49,947,872.00.[8]  JX E32 at DEF0542523.  The $1,577,872 difference reflects a price increase of 3.26%.  Stipulation of Agreed Upon Facts ¶ 13, Doc. No. 62 ("Stip.").  To date, the Navy has paid Metcalf

---

[5] JXE4-JX34.  See Court Exhibit C for a list and summary of each of these modifications.

[6] JX E1 at DEF0064202 (extension to April 16, 2005.); JX E6 at DEF0064438 (extension to May 7, 2005); JX E10 at DEF0064491 (extension to May 12, 2005); JX E14 at DEF0064595 (extension to June 6, 2005); JX E15 at DEF0064598 (extension to July 25, 2005); JX E16 at DEF0064600 (extension to Oct. 10, 2005); JX E17 at DEF0064603 (extension to Oct. 28, 2005); JX E19 at DEF0064608 (extension to Dec. 30, 2005); JX E23 at DEF0064644 (extension to Feb. 9, 2006); JX E24 at DEF0064649 (extension to March 8, 2006); JX E25 at DEF0064652 (extension to June 20, 2006); JX E26 at DEF0064694 (extension to Oct. 17, 2006).

[7] JX E5 at DEF0064410 (increase of $38,436); JX E6 at DEF0064438 (increase of $585,565); JX E7 at DEF0064482-83 (increase of $25,506); JX E9 at DEF0064487 (increase of $14,081); JX E10 at DEF0064491 (increase of $56,640); JX E11 at DEF0064604-05 (increase of $36,432.00); JX E13 at DEF0064583-85 (increase of $142,605.00); JX E16 at DEF0064600 (increase of $94,826); JX E17 at DEF0064603 (increase of $17,622.00); JX E19 at DEF0064607-08 (increase of $592,914); JX E20 at DEF0064612-13 (increase of $10,000); JX E22 at DEF0064637-38 (increase of $301,819); JX E24 at DEF0064649 (increase of $24,652); JX E26 at DEF0064693-94 (increase of $527,176); JX E28 at DEF0064654 (increase of $6,151); JX E29 at DEF0064787 (increase of $101,434).

[8] Metcalf formally objected to prior unilateral equitable adjustments made by the Navy in Modification Nos. 16, 17, 24.  JX E19, 20, 27.

$49,050,899, which is $896,973 less than the final Contract price. Stip. ¶ 14. Metcalf, however, claims it incurred costs in excess of $76 million to complete the 212 Project. Plaintiff Post-Trial Supplemental Brief ("Pl. PT Supp. Br.") at 6 n.6.

## II.    PROCEDURAL HISTORY.

On November 5, 2007, Metcalf filed a Complaint in the United States Court of Federal Claims alleging that the Navy "subjected" Metcalf "to numerous instances of bad faith conduct" (Compl. ¶ 17), resulting in two claims. First, Metcalf alleged that the Navy breached the parties' contract by violating the implied duty of good faith and fair dealing. Compl. ¶¶ 84-95. Second, Metcalf alleged a delay and impact claim against the Navy for increased expenses because of delays caused by the Navy. Compl. ¶¶ 96-114.

On January 28, 2008, the Government filed an Answer. On April 14, 2008, the court convened a status conference and on April 15, 2008, entered a Joint Proposed Scheduling Order. At the request of the parties, the court issued a second Scheduling Order on July 21, 2008. On August 11, 2008, the court entered a Protective Order.

On March 6, 2009, Metcalf filed a Status Report and the parties filed a Joint Motion To Modify The July 21, 2008 Scheduling Order that the court granted on March 9, 2009, and modified again on May 13, 2009.

On July 17, 2009, Metcalf filed an Expert Disclosure, together with attached Exhibits A and B, to advise the court that Metcalf intended to rely on the expert testimony of Messrs. Paul Stynchcomb and Matthew Krafft. On that same date, the Government filed the Expert Report of Mr. Stephen Weathers, together with attached Exhibits 1-98.

On July 30, 2009, the court convened a status conference and on August 5, 2009 modified the May 13, 2009 Scheduling Order to set a trial on January 19-29, 2010. On August 7, 2009, the court amended the July 30, 2009 Scheduling Order to conclude fact discovery by October 16, 2009, and required the filing of any dispositive motions by October 30, 2009.

On September 2, 2009, the Government advised the court that it would call Messrs. Stephen Weathers and Paul Morimoto as rebuttal experts. On that date, Metcalf advised the court that it would call Mr. Matthew Krafft as an expert rebuttal witness.

On September 15, 2009, the court issued an Order extending the deadline for dispositive motions until November 6, 2009. On September 30, 2009, the court convened another status conference. On October 16, 2009, the court entered a Pretrial Order. On November 5, 2009 the court issued an Order further extending the deadline for dispositive motions.

On November 10, 2009, Metcalf filed an Amended Complaint, adding allegations regarding the Contracting Officer ("CO's") February 4, 2008 Final Decision denying Metcalf's March 30, 2007 Global Claim and in tandem claim that it was improperly assessed liquidated damages by the Navy. First Am. Compl. ¶¶ 5-15. Accordingly, Metcalf increased the amount that it sought to recover for the breach of contract claim by approximately $2 million. *Compare*

First Am. Compl. at ¶ 24, *with* Compl. ¶ 95.  Metcalf also renamed its second claim for "Delay and Impact" as "Contract Claims," although the allegations remained almost identical.  First Am. Compl. ¶¶ 111-31.

On November 23, 2009, the court again modified the Scheduling Order to afford the parties additional time to make material evidentiary disclosures and file Proposed Findings of Fact and Conclusions of Law.  On November 30, 2009, the Government filed an Answer and Counterclaim to the November 10, 2009 Amended Complaint and a Motion for Partial Summary Judgment along with Proposed Findings of Uncontroverted Facts.

On December 18, 2009, Metcalf filed a Pretrial Memorandum and a Motion *in Limine*.  On December 22, 2009 Metcalf filed an Answer to the Government's November 30, 2009 Counterclaim.

On December 23, 2009, the Government filed a Stipulation of Pretrial and Trial Procedures.  On December 24, 2009, the Government filed: an Exhibit List; Proposed Findings of Fact and Conclusions of Law; a Witness List; and a Motion *in Limine*, together with supporting Exhibits A-D.  On December 29, 2009, the court convened a status conference.

On January 4, 2010, the court issued an Order granting Metcalf's Unopposed Motion To Enlarge The Deadline For Requesting The Return Of Privileged Documents.  On that date, Metcalf also filed a Response to the Government's November 30, 2009 Motion For Partial Summary Judgment, and Proposed Findings Of Uncontroverted Facts.  On the same day, the Government filed A Stipulation Of Agreed Upon Facts, a Response to Metcalf's December 18, 2009 Motion *in Limine*, and a Motion For Authorization To Serve A Subpoena Outside 100 Miles From Place Of Trial on Mr. James Merriman, a former Metcalf Quality Control Manager.

On January 5, 2010, the court convened a telephone status conference and thereafter entered an Order denying Metcalf's December 18, 2009 Motion *in Limine* and the Government's December 24, 2009 Motion *in Limine*, but granting Metcalf access to certain protected information relied on by the Government's expert witness.  The court also granted the Government's January 4, 2010 Motion For Authorization To Serve A Subpoena Outside 100 Miles From Place Of Trial.

On January 11, 2010, Metcalf filed a Response To The Government's December 24, 2009 Motion *in Limine* and Application For Use Of Deposition of Mr. Gary Engle, one of Metcalf's proposed expert witnesses.  On the same day, the Government filed an Objection to the authenticity of several exhibits Metcalf proposed.

On January 14, 2010, the Government filed the written direct testimony of Mr. Stephen Weathers, P.E., Capital Project Management, Inc., together with attachments Tabs A-Q, and an Amended Exhibit List ("DX").  On January 15, 2010, Metcalf filed written direct testimony of Mr. Matthew Krafft, C.P.A., Senior Managing Director, FTI Consulting, Inc., and Mr. Paul Stynchcomb, a Senior Managing Director at FTI Consulting, Inc., together with Metcalf's exhibits ("PX") and the parties' joint exhibits ("JX").

The first phase of the trial was held in Honolulu, Hawaii on January 19-22, 25-27, 2010, where most Metcalf witnesses and the Government witnesses resided and were employed.

On March 11, 2010, the court convened a telephone conference with the parties and entered an Order to correct the trial transcript, as stipulated by the parties. On March 12, 2010, a Supplemental Expert Report of Mr. Stephen Weathers was filed by the Government, together with Attachments 1-16 (DX 94-DX108).

On March 16-17, 2010, trial resumed in Washington, D.C.

On March 23, 2010, the court issued a Post-Trial Scheduling Order that was amended at the request and with the consent of the parties on May 3, 2010.

On May 14, 2010, Metcalf filed a Post Trial Brief ("Pl. PT Br."), together with Exhibits 1-2. On May 17, 2010, Metcalf filed a Motion For Leave To File A Second Amended Complaint that the Government moved to strike on May 18, 2010. On May 19, 2010, the court convened a status conference. On May 21, 2010, the court issued a Second Revised Post Trial Scheduling Order and a separate Order ruling that the Government's May 18, 2010 Motion To Strike was moot, for the reasons discussed herein. On May 28, 2010, the Government filed a Response To Metcalf's May 17, 2010 Motion For Leave To File A Second Amended Complaint. On June 7, 2010, Metcalf filed a Reply.

On June 23, 2010, the court continued and concluded trial at the Air Force Academy in Colorado Springs, Colorado.

On July 13, 2010, the court entered a Third Revised Post Trial Scheduling Order. On August 18, 2010, the Government filed a Post Trial Brief ("Gov't PT Br."). On September 17, 2010, Metcalf filed a Post Trial Reply Brief ("Pl. PT Br."). On October 1, 2010, the Government filed a Post Trial Reply ("Gov't PT Reply").

On March 10, 2011, Metcalf filed a Supplemental Post Trial Brief ("Pl. Supp PT Br.").

On March 21, 2011, the transcript of the February 18, 2011 oral argument in Washington, D.C. (2/18/11 TR 1-109) was filed.

## III.    DISCUSSION.

### A.    Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2006). The Tucker Act, however, is "'only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages.'" *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Testan*, 424 U.S.

392, 398 (1976)).  Therefore, to satisfy the jurisdictional requirements of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages.  *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

If a plaintiff meets the jurisdictional requirements of the Tucker Act, the plaintiff also must demonstrate compliance with the mandatory requirements of the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-13 (2006).[9]  In order to have jurisdiction under the CDA, a plaintiff must have submitted a written and certified claim to the CO and obtained a final decision by the CO on the claim.  *See M. Maropakis Carpentry, Inc.* v. *United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (CDA jurisdiction "requires both a valid claim and a contracting officer's final decision on that claim").  Although the CDA does not define the term "claim," the United States Court of Appeals for the Federal Circuit has stated that a "claim" is a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain . . . ."  *England* v. *The Swanson Grp., Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) (quoting FAR § 2.201).

For claims over $100,000, Congress also requires that "the contractor . . . certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the [G]overnment is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor."  41 U.S.C. § 605(c)(1) (2006).  In addition, for claims over $100,000, a failure to "issue a decision" or "notify the contractor of the time within which a decision will be issued" within sixty days of receipt of the claim is "deemed to be a decision by the [CO] denying the claim[.]"  41 U.S.C. § 605(c)(2), (5) (2006).

On March 30, 2007, Metcalf filed a "Global Claim" with the CO.  JX K1; PX 525.  Therein, Metcalf claimed that the Navy breached the Contract by failing to administer it in good faith.  JX K1 at DEF0064739-40.  In support, Metcalf recited 17 examples of the Navy's bad faith, but the primary focus appears to be the Navy's requirement that Metcalf use Primavera SureTrak scheduling software; the Navy's refusal to recognize expansive soils as a differing site condition; and the Navy's conduct regarding unanticipated levels of chlordane contamination at the site.  JX K1 at DEF0064746-72.

---

[9]  As of January 4, 2011, Congress amended certain provisions of the CDA, and recodified the Act, as amended, at 41 U.S.C. §§ 7101-7109.  *See* Public Contracts Act of Jan. 4, 2011, Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3816-26.  Although the Public Contracts Act repealed 41 U.S.C. §§ 601-13, any "rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act" are still governed by these sections of the United States Code.  Pub. L. No. 111-350, § 7(b), 124 Stat. at 3855.

1.      **To Adjudicate Claims Alleged In The November 10, 2009 First Amended Complaint.**

On November 10, 2009, Metcalf filed a First Amended Complaint that contained two Counts: "Count I – Breach of Contract/Breach of [the] Duty of Good Faith and Fair Dealing." First Am. Compl. ¶ 95-105. As plead, the First Amended Complaint seeks $27,913,829 for *each* of the legal claims specified under Count I. "Count II – Contract Claims," incorporated by reference all of the allegations in Count I and additional allegations as to: "Differing Site Conditions" (*e.g.*, First Am. Compl. ¶¶ 113-118, 120, 122, 125); improper Navy "credits" for Metcalf's "installation of roofing tiles without wood battens" and "alleged landscape deficiencies" (First Am. Compl. ¶ 119); improper change orders and imposition of delay by the Navy (*e.g.*, First Am. Compl. ¶¶ 121, 123); improper imposition of $896,973 liquidated damages (First Am. Compl. ¶ 124); denied "delay and impact claims," from the March 30, 2007 "Global Claim" in the amount of $17,250,124 (First Am. Compl. ¶¶ 126-129), but "revised" to $10,323,007, First Am. Compl. ¶¶ 130-131. The Prayer For Relief requests $27,913,829 in nominal damages for Count I *or* $10,323,007 in nominal damages for Count II. First Am. Compl. ¶ 24.

Paragraphs 89-94 of the November 10, 2009 First Amended Complaint, however, recite a series of allegations relating to a May 1, 2007 debarment action that was subject to a prior suit by Metcalf against the Navy. Compl. ¶¶ 89-94**.** On Friday October 12, 2007, at a hearing on Metcalf's Motion for a Temporary Restraining Order enjoining the debarment, the United States District Court For the District of Columbia indicated that the Navy appeared to have acted in an arbitrary and capricious manner. PX 459 (transcript from *Metcalf* v. *Winter*, 07-1839 (D.D.C. Oct. 12, 2007). Thereafter, the Navy unilaterally rescinded the May 1, 2007 debarment action. For this reason, Paragraphs 89-94 of the May 17, 2010 Second Amended Complaint are dismissed, as moot.

The court, however, has determined that it has jurisdiction to adjudicate the remaining allegations set forth in the November 10, 2009 First Amended Complaint because Metcalf's claims were first submitted to the CO in Metcalf's March 30, 2007 Global Complaint. PX 525.

2.      **To Adjudicate Claims Alleged In The May 17, 2010 Second Amended Complaint.**

On January 19, 2010 trial commenced and continued until January 27, 2010. On March 16-17, 2010, the trial continued, but was not scheduled to conclude until after June 23, 2010.

On May 17, 2010, Metcalf filed a Motion For Leave To File A Second Amended Complaint that alleges in Count I that the Navy breached the "Contract" *and* breached the duty of good faith and fair dealing. Sec. Am. Compl. ¶¶ 95-110. As a result, Metcalf alleges that it is due $27,913,829, *i.e.*, the amount submitted to the CO in Metcalf's March 30, 2007 Global Claim. Sec. Am. Compl. ¶109. In addition, Count II alleges that the Navy's actions amounted to a "Breach of Contract/Cardinal Change." Sec. Am. Compl., Count II; *see also* Sec. Am. Compl.

¶¶ 111-34.  As a result of the Navy's "cardinal changes" to the Contract, Count II alleges that the Navy owes Metcalf $27,913,829.  Sec. Am. Comp. ¶¶ 134.[10]

Metcalf's shift in legal theories after all but one witness testified at trial raises several issues, not the least of which is the Government's right to notice and due process.  *See Grand Light & Supply Co.* v. *Honeywell Inc.*, 771 F.2d 672, 680-81 (2d. Cir. 1985) ("The trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b), particularly in light of the notice demands of procedural due process") (internal citations and quotations omitted).

Therefore, the first issue the court must resolve is whether it has jurisdiction to adjudicate Metcalf's claims under a cardinal change theory.  *See Scott Timber Co.* v. *United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) ("An action brought before the Court of Federal Claims under the [Contract Disputes Act] must be 'based on the same claim previously presented to and denied by the contracting officer.'" (quoting *Cerberonics, Inc.* v. *United States*, 13 Cl. Ct. 415, 417 (1987))).   The court has jurisdiction to adjudicate claims under a legal theory that was not submitted to the CO, so long as it concerns the same underlying facts that were presented to the CO.  *See Scott Timber*, 333 F.3d. at 1365-66 (holding that the United States Court of Federal Claims has jurisdiction over new claims if "they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery.").  Since Metcalf's cardinal change theory involves the same facts and seeks similar relief, as set forth in the March 30, 2007 Global Claim, the court has jurisdiction to adjudicate Metcalf's claim under this theory.

Proceeding to the merits, however, a motion to amend, pursuant to RCFC 15, should be granted only if an issue, not raised by the pleadings, was tried by the parties' express or implied consent.  *See* RCFC 15(b)(2); *see also Net MoneyIN, Inc.* v. *VeriSign, Inc.*, 545 F.3d 1359, 1372 (Fed. Cir. 2008) ("A [trial] court generally enjoys broad discretion when assessing the propriety of a motion to amend.  It does not enjoy such discretion, however, and amendment is mandatory, when an issue is tried with the express or implied consent of the parties.") (citation omitted); *Laningham* v. *United States*, 5 Cl. Ct. 146, 156 (Cl. Ct. 1984) ("[T]he application of [RCFC 15(b)] must be limited to issues that were actually tried by express or implied consent of the parties, so as to prevent prejudice to the opposing party and permit opportunity to defend all claims.").

Although the United States Court of Appeals for the Federal Circuit has not had an occasion to rule on the circumstances under which implied consent should be assumed when an issue not pled, the other federal appellate courts have uniformly ruled that, where evidence is introduced at trial to establish a properly pled issue, implied consent may not be assumed as to issues not pled.[11]

---

[10] The court has depicted the evolution of Count II of Metcalf's Complaint in Court Exhibit D.

[11] *See, e.g.*, *Farfaras* v. *Citizens Bank and Trust of Chicago*, 433 F.3d 558, 568 (7th Cir. 2006) (affirming a trial court's determination that defendant's affirmative defense was not raised, where the testimony purportedly raising the defense was also relevant to a properly pled issue); *Patelco Credit Union* v. *Sahni*, 262 F.3d 897, 907 (9th Cir. 2001) ("The introduction of evidence

Therefore, the court analyze whether Metcalf's cardinal change theory was tried by consent of the parties or if consent should be implied from the record.

Metcalf's argument that the Government was on notice that the cardinal change theory was at issue rests on Metcalf's December 18, 2009 Pretrial Memorandum.  12/18/09 Pl. Mem. at 35 ("[T]he Navy . . . materially transformed a design-build effort into the functional equivalent of a design-bid-build effort.  This is a cardinal change.");[12] *see also* TR at 2623 (argument by

that directly addresses a pleaded issue does not put the opposing party on notice that an unpleaded issue is being raised."); *Douglas* v. *Owens*, 50 F.3d 1226, 1236 (3d Cir. 1995) ("[A]n issue [is] not . . . tried by implied consent[,] if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried[.]"); *Gamma-10 Plastics* v. *American President Lines*, 32 F.3d 1244, 1256 (8th Cir. 1994) ("[A trial] court is not required to grant a motion to amend on the basis of some evidence that would be relevant to the new claim if the same evidence was also relevant to a claim originally pled."); *Quillen* v. *Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) ("[A] court will not imply consent to try a claim merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim."); *Hardin* v. *Manitowoc-Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir. 1982) ("When the evidence claimed to show that an issue was tried by consent is relevant to an issue already in the case, and there is no indication that the party presenting the evidence intended thereby to raise a new issue, amendment may be denied in the discretion of the trial court.")); *cf. Christianson* v. *Colt Indus. Operating Corp.*, 486 U.S. 800, 814-15 (1988) (holding that pleadings were not amended to include a patent law claim by implied consent, where the parties' briefs discussed patent law issues, but did so "squarely within the purview of the [non-patent] theories of recovery, defenses, and counterclaims that the pleadings already encompassed").  In addition, where admitted evidence is relevant to issues that properly were pled prior to trial, the burden is on the moving party to demonstrate that the non-moving party consented to the addition of a new issue.  *See United States* v. *Shanbaum*, 10 F.3d 305, 312-13 (5th Cir. 1994) ("If the evidence that supports the unpleaded issue is also relevant to another issue in the case, the introduction of this evidence may not be used to show consent to trial of a new issue absent a clear indication that the party who introduced the evidence was attempting to raise a new issue."); *see also Triad Elec. & Controls, Inc.* v. *Power Systems Engineering, Inc.*, 117 F.3d 180, 194 (5th Cir. 1997) (same); *Galindo* v. *Stoody Co.*, 793 F.2d 1502, 1513 (9th Cir. 1986) ("[T]he record must indicate that the parties understood that the evidence was aimed at an unpleaded issue.").  Finally, mere mention of an unpled claim in a pre-trial briefing will not suffice to demonstrate the defendant's consent to try the issue.  *See Fanning* v. *Potter*, 614 F.3d 845, 851 (8th Cir. 2010) (holding that referencing the existence of an administrative complaint in the district court complaint, without specifically alleging a cause of action, was insufficient to put the agency on notice of consenting to try a claim under Rule 15(b)(2), where "[t]he parties did not squarely address the claim in their summary judgment briefs.").

[12] Metcalf's June 17, 2010 Reply To the Government's Response To Motion For Leave to File Second Amended Complaint argued that it "devoted an entire section of its [pre-trial December 18, 2009 Memorandum of Law] to its cardinal change theory."  Pl. Rep. at 2.  This "entire section" consisted of two paragraphs in a 48 page brief.  12/18/09 Pl. Mem. at 35-36.

Metcalf's counsel on 6/23/10).  If it was Metcalf's intent to have this new theory considered by the court at trial, it should have moved to amend the November 10, 2009 First Amended Complaint on December 18, 2009, before trial was scheduled to commence.  Metcalf, however, was aware that it faced a substantial burden to justify further amending a complaint only thirty-eight days after the last amendment and thirty-two days before trial.  *See Foman* v. *Davies*, 371 U.S. 178, 182 (1962) (requiring a party seeking to amend a complaint prior to trial under FRCP 15(a) to establish no "undue delay, bad faith, or dilatory motive" and "no undue prejudice to the Government"); *see also Engineered Prods. Co.* v. *Donaldson Co.*, 147 Fed. Appx. 979, 987-88 (Fed. Cir. 2005) (unpublished) (upholding a trial court's refusal to allow an amendment to a complaint "one month before trial," where there was "little justification for the delay" and where the amendment "had some smack of gamesmanship"); *Cooke* v. *United States*, 79 Fed. Cl. 741, 742-43 (2007) ("Undue prejudice may be found when an amended pleading would cause unfair surprise to the opposing party, unreasonably broaden the issues, or require additional discovery."); *Christofferson* v. *United States*, 77 Fed. Cl. 361, 365 (2007) (determining no "undue delay" where "[t]he facts and circumstances relating to the substance . . . of the new claim were apparently known [to the Plaintiff] from the beginning.).

In this case, Metcalf did not to seek leave to amend the November 10, 2009 First Amended Complaint on December 18, 2009, and thereby address its burden in a straightforward manner.  Instead, Metcalf decided to proceed "under the radar screen" until thirty-four days before the final day of trial, where one of Metcalf's witnesses, Capt. William Grip, was the only witness scheduled to appear.  Examining Metcalf's actions in the entire context of the trial provides further insight.  On January 19, 2010, Metcalf's counsel did not use the words "cardinal change" in opening argument[13] or thereafter until the last day of trial on June 23, 2010, when the court *sua sponte* expressed concern about Metcalf's May 17, 2010 Motion For Leave To File Second Amended Complaint.  TR 2618-30.  Although Metcalf introduced evidence at trial that was relevant to both the breach of contract and breach of the duty of good faith and fair dealing claims, there is no indication in this record that the Government actually or implicitly consented at trial to the introduction of evidence specifically to support a cardinal change theory.[14]

---

[13]  Instead, Metcalf's counsel made numerous statements in opening argument about "differing site conditions."  *See, e.g.,* TR 20, 24-25, 27-28, 30, 32, 34, 45-46, 69-71, 74, 153, 155, 157-59, 161-63, 166-67, 172, 196, 207, 231, 235-36, 243.

[14]  The Government's December 24, 2009 Proposed Findings Of Fact And Conclusions Of Law did not address nor consent to Metcalf's cardinal change theory.  The Government's silence does not evidence consent under these circumstances.  *Compare*, *e.g.*, *Pinkley, Inc.* v. *City of Frederick*, 191 F.3d 394, 402 (4th Cir. 1999) (holding that defendant did not consent to the trial of an unpled claim, where "[Defendant] never conceded that [the new claim] was at issue in the trial" and where "plaintiff in its opening statement did not mention [the new claim]" and where the defendant's Motion For Judgment conceded the new claim was not at issue), *with Owner—Operator Independent Drivers Ass'n, Inc.*, v. *USIS Commercial Servs.*, 537 F.3d 1184, 1190 (10th Cir. 2008) (holding that the defendant impliedly consented to new issue, where it was preserved in a Final Pretrial Order and addressed on the merits by *both* parties in their pre-trial briefs).

For these reasons, the court has determined that, as a matter of law, Metcalf's May 17, 2010 Motion To File A Second Amended Complaint must be denied.

### B.     Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (*quoting Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992)). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan*, 504 U.S. at 560-61. Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and  . . .  actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted).

The First Amended Complaint alleges that Metcalf incurred monetary injury that is concrete, particularized, fairly traceable to the allegations regarding the Navy's actions, and that financial injury can be redressed by a monetary award. For these reasons, the court has determined that Metcalf has standing to seek adjudication of the claims set forth in the First Amended Complaint.

### C.     First Amended Complaint Count I: Alleged Breach of Contract/Breach of Good Faith And Fair Dealing Claims.

Metcalf's November 10, 2009 First Amended Complaint alleges that the Navy engaged in "maladministration and misconduct" (First Am. Compl ¶¶ 28-29) through a series of actions, including:

Example 1: requiring Metcalf to use of "Primavera SureTrack" scheduling software before approving Metcalf's Baseline Schedule (First Am. Compl. ¶¶ 30-36);

Example 2: failing "timely [to] investigate" and "unreasonably rejecting" a report by Geolabs, Inc. and one by Stewart Engineering, advising of "expansive soils" at the site  (First Am. Compl. at ¶¶ 37-71);

Example 3: "downplay[ing] chlordane contamination" and providing Metcalf with "conflicting directives" regarding remediation and management.  (First Am. Compl. ¶¶ 72-87).

"Other examples" cited included the Navy's:

1)  "interfering" with Metcalf's "contemplated design revisions," "construction means and methods" (First Am. Compl. ¶ 88);

2) "overcomplicating certain simple repairs," "overinspecting . . . work," and "hassling subcontractors concerning performance qualifications," "misinterpreting provisions of the Contract and applicable industry codes," and "providing untimely notice of baseless concerns about work . . . in place" (First Am. Compl. ¶ 88);

3) "arbitrarily rejecting submittals" (First Am. Compl. ¶ 88);

4) "inconsistently administering the payment process" (First Am. Compl. ¶ 88);

5) "enforcing in an abusive manor the safety program employed by Metcalf" (First Am. Compl. ¶ 88);

6) "actively interfering with Metcalf's efforts to complete and turn over housing units" (First Am. Compl. ¶ 88).

### 1. Governing Precedent.

#### a. Breach Of Contract.

The governing precedent of the United States Court of Appeals for the Federal Circuit regarding breach of contract is grounded in well established principles. "To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Distrib.* v. *United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). The burden of proof, however, lies with the plaintiff to establish each of these elements by a preponderance of the evidence. *See Mobil Oil Exploration & Producing Southeast* v. *United States*, 530 U.S. 604, 607-08 (2000) (holding "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.") (internal quotation marks omitted).

#### b. Breach Of Duty Of Good Faith And Fair Dealing.

The United States Court of Appeals for the Federal Circuit recently defined the duty of good faith and fair dealing "to not interfere with another party's rights under the contract." *Precision Pine & Timber, Inc.* v. *United States*, 596 F.3d 817, 828 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 997 (2011); *see also* RESTATEMENT (Second) OF CONTRACTS § 205 cmt. a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party[.]").

In addition, our appellate court requires that a breach of the duty of good faith and fair dealing claim against the Government can only be established by a showing that it "specifically designed to reappropriate the benefits [that] the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." *Precision*

*Pine*, 596 F.3d at 829; *see also Centex Corp.* v. *United States*, 395 F.3d 1283, 1304-07 (Fed. Cir. 2005) (affirming trial court's judgment that Government breached the implied covenant of good faith and fair dealing when Congress enacted targeted tax legislation depriving Plaintiffs of "a substantial part of the benefit of their contract with [the Government]").   Short of such interference, it is well established that federal officials are presumed to act in good faith, so that "[a]ny analysis of a question of Governmental bad faith must begin with the presumption that public officials act conscientiously in the discharge of their duties."  *See Kalvar Corp.* v. *United States*, 543 F.2d 1298, 1301 (Ct. Cl. 1976) (internal quotation marks and citation omitted); *see also Spezzaferro* v. *Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed. Cir. 1986) ("Government officials are presumed to carry out their duties in good faith.").

Therefore, incompetence and/or the failure to cooperate or accommodate a contractor's request do not trigger the duty of good faith and fair dealing, unless the Government "specifically targeted" action to obtain the "benefit of [the] contract" or where Government actions were "undertaken for the purpose of delaying or hampering [performance of the] contract[.]"  *Precision Pine*, 596 F.3d at 829; *see also Malone* v. *United States*, 849 F.2d 1441, 1445-46 (Fed. Cir. 1988) (holding that only where the CO's "evasive conduct misled [plaintiff] to perform roughly 70% of its contractual obligation in reliance on a workmanship standard" was the issue of breach of good faith and fair dealing invoked).

Of course a contract may be rendered unenforceable, because of duress, but the plaintiff must establish "(1) that it involuntarily accepted the other party's terms, (2) that circumstances permitted no other alternative, *and* (3) that such circumstances were the result of the other party's coercive acts."  *North Star Steel Co.* v. *United States*, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (emphasis added); *see also Rumsfeld* v. *Freedom NY, Inc.*, 329 F.3d 1320, 1330 (Fed. Cir. 2003) ("'[E]conomic pressure and even the threat of considerable financial loss are not duress.'" (quoting *Johnson, Drake & Piper, Inc.* v. *United States*, 531 F.2d 1037, 1042 (Ct. Cl. 1976))).

### 2.     The Allegations In The First Amended Complaint - Count I.

Each of the allegations in Count I of the First Amended Complaint is analyzed herein, first by discussing the factual evidence adduced at trial, followed by the parties' arguments, and then the court's determination as to whether Metcalf met its burden of proof to establish that the Navy activity at issue was a breach of the Contract and/or a breach of the duty of good faith and fair dealing.

### a.     The Navy Required Plaintiff To Use "Primavera SureTrak" Scheduling Software Before Approving Plaintiff's "Baseline Schedule" (First Am. Compl. ¶¶ 30-36).

### i.     Relevant Facts.

The RFP, at Section 4E, "Required Contractor Specification Format," required contractors to conform to the NAVAL FACILITIES GUIDE SPECIFICATIONS.  JX A1 at DEF0498602. Those specifications required that "schedules submitted for this project must be prepared using either Primavera P3 or Primavera SureTrak [Scheduling Software]."  DX 127 at DEF0467221.

In August 2003, Metcalf provided the Navy with a Baseline Schedule[15] for the work to be performed utilizing a software program, known as Microsoft Project, that Metcalf routinely used for commercial non-federal government work.  PX 75.  On August 6, 2003, the Navy rejected Metcalf's proposed schedule because it "was not in compliance [with] section 1321 N and SureTrak Sch. Req'd."  PX 75.

In October 2003, Metcalf purchased Primavera SureTrak scheduling software and began re-programming the Baseline Schedule, although Metcalf personnel were not familiar with this software.  PX 88, 95; TR 1393-94 (Oellien).

### ii.    The Parties' Arguments.

Metcalf argues that it was not required to use SureTrack software "to schedule work and monitor progress," because this was a design/build project and FAR 52.236-5(a) prohibits the Navy from specifying certain "materials" by trade name, and/or the contract does not mention "SureTrack."  Pl. PT Br. at 89-90; *see also id.* at 91-100.  Therefore, the 143-day delay, *i.e.*, from September 5, 2003, the date of Metcalf's initial planned schedule acceptance, to January 26, 2004, *i.e.*, the date of the Navy's final schedule approval, was caused by the Navy's requirement that Metcalf use Primavera SureTrack scheduling software to create the required Baseline Schedule.  First Am. Compl. ¶ 35 (generally alleging that migration to SureTrak "delayed commencement of construction activities"); *see also* Pl. PT Br. at 95-96.  In addition, Metcalf asserts, since the Navy approved Metcalf's proposed schedule on November 24, 2003 (DX 916 at DEF0214700), that is the proper date to demark "Schedule Acceptances Prior To Start of Work," instead of January 26, 2004.

The Government counters that the Contract required Metcalf to utilize Primavera SureTrack scheduling software.  Gov't PT Br. at 34-37.  Consequently, Metcalf failed to establish any actions by the Navy that evidence a breach of contract or a breach of the duty of good faith and fair dealing.  Gov't PT Br. at 37-40.

### iii.    The Court's Resolution.

The RFP, as incorporated into the Contract, specified that Metcalf was required to use either Primavera P3 or Primavera SureTrack scheduling software to create the Baseline Schedule.[16]  Therefore, the court has determined that the Navy's requirement that Metcalf

---

[15]  The "Baseline Network Analysis Schedule" was required to be "submitted and accepted by the Government before the contractor will be allowed to start work on the construction stage(s) of the contract.  Examples of the construction stages are, but not limited to; [sic] demolition, site work, temporary work for construction, etc."  DX 127 at DEF0467220.

[16]  In the "Required Contractor Specifications Format" section, the April 5, 2001 RFP requires that the successful contractor comply with Naval Facilities Guide Specifications ("NFGS") describing "material quality and requirements, and installation or application

comply with this requirement did not breach the Contract.  *See McAbee Constr., Inc.* v. *United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (holding that contract interpretation begins with the "plain language" thereof).

In addition, the Navy's requirement that Metcalf use a specific software program to create a Baseline Schedule for the 212 Project did not and could not breach the duty of good faith and fair dealing, particularly in light of the fact that Metcalf never even bothered to request a variance.  *See Precision Pine*, 596 F.3d at 829 (holding that the duty of good faith and fair dealing is typically violated only where "government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract").

For these reasons, the court has determined that Metcalf has failed to establish that the Navy's required use of Primavera Software violated the Contract and/or breached the Navy's duty of good faith and fair dealing.

**b.      The Navy Failed To "Timely Investigate" And "Unreasonably Rejected" The Reports Of Plaintiff's Subcontractors, Geolabs, Inc., And Stewart Engineering, Reporting "Expansive Soils" At The Construction Site (First Am. Compl. ¶¶ 37-71).**

**i.      Relevant Facts.**

On December 18, 2000, Ernest K Hirata & Associates, Inc. ("Hirata"), submitted a Soil Reconnaissance Report detailing the characteristics of soil expansion at the site ("the HIRATA REPORT") to the Navy.  JX A1 at DEF049846-704, the Section entitled "SOIL CONDITIONS" thereof, states:

> The surface soil generally consisted of brown silty clay with sand and coral
> fragments.  The silty clay was in a medium stiff to stiff condition and ranged from

---

procedures of construction."     JX A1 at DEF 0498602.     UFGS, Division 01—General Requirements, Section 01321N provides:

> The scheduling software that will be utilized by the Government on this project is
> [SureTrak by Primavera Systems, Inc.] [Primavera Project Planner (P3) by
> Primavera Systems, Inc.]. Notwithstanding any other provision in the contract,
> schedules submitted for this project must be prepared using *either Primavera P3
> or Primavera SureTrak* (files saved in Concentric P3 format).  The Contractor
> shall provide electronic files saved in a format that is compatible with the
> Contracting Officer's current software version. Submission of data from another
> software system where data conversion techniques or software is used to import
> into Primavera's scheduling software is not acceptable and will be cause for
> rejection of the submitted schedule.

DX 127 at DEF 0467221 (emphasis added).

about 0.3 to 2 meters in thickness. Laboratory testing on the surface soil indicated a slight expansion potential.

JX A1 at DEF0498653 (RFP App. B. — HIRATA REPORT); *see also* JX A1 at DEF0498474-75 (RFP requirement that the contractor conduct an independent soil investigation).

Paragraph 2D.1.a of the April 5, 2001 RFP also called for the construction of permanent foundations comprised of concrete footings and slabs-on-grade:

> FOUNDATIONS/SLABS-ON-GRADE/SLABS-ON-PIER:  Permanent foundations with concrete footings and/or concrete foundation walls, slabs-on-grade and/or slabs-on-pier are required. *See soils report for site preparation, foundation support, footing, slab and reinforcement requirements.*

JX A1 at DEF0498516 (emphasis added).

During an April 27, 2001 pre-proposal question and answer opportunity, the following exchange took place:

> Q15: Page 2B-1, Para. 2B.1.c. Contractor Soil Investigation Report. This requires an independent investigation after award.  The last two sentences state "submit in writing proposed or requested changes to the Government requirements with appropriate technical data.  Changes are subject to approval by the Contracting Officer."  Should we infer from this that *any unforeseen soil conditions or variances from the Government's soils report will be dealt with by change order*?
>
> Answer:  *Yes*, if there's a major disparity from the Government's soil reconnaissance report.

JX D1 at DEF0063555 (emphasis added).

The July 17, 2002 revised RFP specifically stated in the "GOVERNMENT SOIL INVESTIGATION REPORT" that "The requirements contained in the Government's soil reconnaissance report, (Appendix B) are *for preliminary information only*."  JX A1 at DEF0498474 (emphasis added).  In addition, potential contractors were advised of their responsibility to perform post-award site design and engineering work, including the retention of a geotechnical engineering firm to conduct soil investigations to ensure that the contractor's design addressed relevant geotechnical issues.  JX A1 at DEF0498474.

On or around January 30, 2003, Metcalf hired Geolabs, Inc., ("Geolabs"), to conduct a soil investigation.  DX 2857.[17]  On May 7, 2003, Geolabs issued a Field Exploration Report finding moderate to high "swelling potential" for the soil.[18]  PX 66.

---

[17] On March 24, 2003, Metcalf hired Shockley and Burridge, LLC, d.b.a. Division 2 Construction ("D2C"), to begin sitework and foundation preparation.  DX 145.  In addition, D2C was hired to prepare and lay five concrete slabs per week.  DX 145 at PX 123153; TR at 859-60 (Chun).

A June 20, 2003 report issued by Geolabs ("GEOLABS REPORT") also found that "[t]he moderately to highly expansive near-surface soils appear to differ significantly from the near-surface soils encountered during the preliminary field investigation performed by Ernest K. Hirata & Associates, Inc."  PX 69 at 00266; *compare* JX A1 at DEF0498665 (RFP Appendix B the HIRATA REPORT) (finding swell values between 0.0-1.5%.).  The GEOLABS REPORT also found that soil samples exhibited "moderate to high swelling potential," with swell values between 2.3-16.1%.  PX 69 at 00267.  Because of the swelling potential, the GEOLABS REPORT recommended that the building pads be over-excavated by two feet beyond the housing units and that slab subgrades be capped with 600mm (two feet) of non-expansive granular fill.  PX 69 at 00268; TR 1030-31 (Lim).  The GEOLABS REPORT concluded that, if the design in the HIRATA REPORT was implemented, there would be a significant risk of slab failure.  TR 1030 (Lim).

On June 24, 2003, Metcalf filed a written notice with the CO of a "differing site condition," pursuant to FAR 52.236-2 "Differing Site Conditions,"[19] together with the June 20, 2003 GEOLABS REPORT.  PX 69.[20]  After receiving this information, the Navy's first response was to assume no differing site condition existed.  PX 71 at DEF0546961 (June 25, 2003 email from Stanley Sasaki EFDPAC to the Navy's CO: "As far as the information provided in our soils

---

[18] Expansive soils are clay-like soils that have a strong affinity to moisture and expand when subject to it.  TR 1027 (Lim).  As a result, expansive soils can move, causing cracking in the concrete slab foundations and damage to other construction elements.  TR 1030 (Lim).

[19] FAR 52.236-2 provides:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in [the] contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice [of a differing site condition from the contractor]. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

48 C.F.R. § 52.236-2 (2002).

[20] The Award Document- Part 1, Attachment G, FAR Clause 52.236-2 "DIFFERING SITE CONDITIONS (APR 1984)" states: "The Contractor shall promptly . . . give a written notice to the Contracting Officer of . . . physical conditions at the site which differ materially from those indicated in this contract . . . The Contracting Officer shall investigate the site conditions promptly after receiving notice."  JX D1 at DEF0063709.

report is concern[ed], the fact that it differs significantly from the soils report generated by the contractor in itself does not warrant an equitable adjustment. . . . If the Contractor decided to base the cost of the work relying upon the government[-]provided data, that's the risk they took and any consequences resulting therefrom is their responsibility."). Therefore, the Navy did not treat Metcalf's June 24, 2003 filing as a "differing site condition" notice. PX 93; TR 155 (Matsuura).

Nevertheless, on July 3, 2003, Hirata sent a memorandum to Danilo Lopez Associates, with comments responding to the GEOLABS REPORT. PX 72. Therein, Hirata observed that the different results obtained by Geolabs probably could be explained by their use of a different testing methodology. PX 72 at 00258.

On August 4, 2003, the Navy's Project Design Engineer reported that, after meeting with Metcalf and the CO, it was "agreed that clayey soil is present," and Metcalf was asked to submit a proposal "to replace the clayey soil under the buildings." PX 76.

In August 2003, Metcalf began to mobilize at the construction site, incurring approximately $4,000 per day in overhead costs, although a subsequent Navy audit subsequently revised that amount to $2,700. TR 1429 (Metcalf).

On September 10, 2003, the Navy's CO sent an e-mail to Metcalf's Project Manager, forwarding an interim Notice for Metcalf to Proceed with site development work. PX 80.

On September 22, 2003, Metcalf submitted RFI #0008 regarding the impact of the expansive soil condition on the design, cost, and schedule of the 212 Project. PX 81. Two days later, Metcalf submitted another request for $1,478,823 and a twenty-five-day extension to replace two feet of expansive soil under seventy-three buildings. PX 82. In response, the Navy informed Metcalf that it had not established a "differing site condition," because "[a]ll that can be substantiated is different testing methods produce different swell potentials." PX 86.

On October 27, 2003, Metcalf submitted an updated GEOLABS REPORT that indicated the presence of soil at the site with the "moderate to high potential for shrinking and swelling" and recommended over excavating and that the soil be "capped" with non-expansive fill. PX 92 at DEF0383755.

On October 27, 2003, the Navy's CO advised Metcalf: "[t]o date, you have failed to promptly provide the written notice required to determine whether or not a differing site condition exists. Failure to provide the necessary information for a differing site determination by November 10, 2003 will be considered by this office to result in forfeiture of your rights to recover an equitable adjustment for this alleged differing site condition." PX 93 at DEF0143221-222.[21]

---

[21] At trial, the Navy's CO was unable to identify anything in the Contract or FAR that supported her conclusion that if Metcalf failed to provide requested information by November 10, 2003 that Navy would be compelled to deny Metcalf's claim for an equitable adjustment. TR 161-62 (Matsuura).

On November 19, 2003, the Navy approved Metcalf's building design plans and specifications. PX 105; *see also* JX I (building designs). Metcalf began work on the pads for the prototypes following the recommendation of the GEOLABS REPORT calling for 90% compaction, instead of the 93%-100% compaction standard set forth in the RFP. PX 124.

On December 17, 2003, Weidig Geoanalysts ("Weidig") also was retained by Metcalf "to resolve a dispute between the two firms [Hirata and Geolabs] concerning the expansiveness of the soils within the subject areas." PX 116 at DEF0519086. On January 21, 2004, Weidig issued a report concluding that every shrink-swell value was at least 12.0% and thus, the soil was considered "highly expansive" and "concur[red] with the fundamental conclusion advanced by Geolabs that the *soils over at least half the entire project area are expansively*. [sic]" PX 116 at DEF0519086 (emphasis added).

On January 30, 2004, based on Weidig's and Geolabs' recommendations, Metcalf filed a second Notice of Differing Site Condition. PX 120. At that time, Metcalf informed the Navy of its intent to proceed with Geolabs' recommendations, *i.e.*, per designs approved by the Navy on November 19, 2003. PX 92, 120; TR 1415-16 (Oellien).

On February 9, 2004, a Metcalf Quality Control Manager, recommended for this job by the Navy, cited Metcalf for failing to compact soils at 95% rate per the Contract, instead of 90%, per Geolabs' recommendation. PX 122, 124 at 2; *see also* TR 527, 918, 948-49 (Chun). In response, the Navy's CO directed Metcalf to comply with Section 02301 of the Specifications, requiring a 95% compaction rate, instead of the 90% compaction rate recommended by Geolabs, even though the Navy had not yet resolved Metcalf's notice of differing site conditions. PX 124 at 1.

On February 12, 2004, the Navy informed Metcalf that the Contract required a 93%-100% compaction rate and Metcalf's failure specifically to comply could result in the issuance of a non-compliance notice. PX 124. On February 20, 2004, the Navy sent a non-compliance notice warning Metcalf to correct the situation or the Navy would do so and charge Metcalf or terminate Metcalf for default. PX 127 at DEF0326975-76.

In late February 2004, Metcalf requested that the Navy issue a variance in response to the June 20, 2003 GEOLABS REPORT. PX 129. On March 1, 2004, Metcalf's request was disapproved as not in compliance with the RFP, because the Navy determined that, at a 90% compaction rate, there would be a risk of "soil densification." PX 129-30, 136 ¶ 1.5.

On March 4, 2004, the Navy sent Metcalf another notice of non-compliance. PX 132. On March 8, 2004, Metcalf responded, explaining that the expansive soil situation was a change in the site condition and the Navy's insistence on compliance at a 95% compaction rate would lead to defective work. PX 133.

On March 19, 2004, Metcalf sent a letter to the Navy Command detailing problems arising from the Navy's CME, regarding the Navy's delay in responding to Metcalf's differing site condition claim. PX 138 at DEF0519098.

In early April 2004, the Navy decided to revisit Metcalf's differing site conditions claim, but on April 7, 2004, Metcalf was advised that the Navy's "position has gone about 180 degrees from where it was a few weeks back" and was one "Metcalf won't like to hear[.]"  PX 141.

On April 19, 2004, Metcalf submitted new draft specifications to address the expansive soil conditions and submitted them to the Navy for approval.  PX 143.  The revised specifications were rejected approximately twenty-one days later for being handwritten, but were approved, twenty-one days thereafter, once Metcalf resubmitted a typewritten copy.  TR 533-34 (Chun).

On April 26, 2004, representatives from the Navy's Pacific Division met with representatives from Metcalf and Geolabs to discuss Metcalf's January 30, 2004 (second) Notice of a Differing Site Condition.  PX 147 at DEF0164413.  The Navy explained that there was no "material[] differ[ence]" between the HIRATA REPORT and the GEOLABS REPORT, because Geolabs did not employ the "standard test."[22]  PX 147 at DEF0164413.  Geolabs responded that it did not perform the specified ASTM D 4829 Expansion Index test for soils ("the ASTM test") because the City and County of Honolulu do not require the use of the ASTM test.  PX 147 at DEF0164414.[23]  Although the differing testing procedures were not resolved, the Navy did agree to "issue a modification to [the Contract authorizing Metcalf] to build the two prototype buildings in accordance with Geolabs' recommendations to remove 2 feet of expansive soil."  PX 147 at DEF0164415.  In addition, the Navy agreed that Geolabs should continue to perform additional soil sampling and testing.  PX 147 at DEF0164415.

On May 24, 2004, Metcalf sent the latest Geolabs test results to the Navy.  PX 182.  The Navy, however, continued to insist that a differing site condition did not exist, because the GEOLABS REPORT "indicate[d] a very low to low expansion potential as classified by ASTM D 4829."  PX 194 at DEF0519152.

---

[22] The RFP states "[t]he design and construction shall be in accordance with sound construction practices . . . and the following criteria . . . 2. Uniform Building Code ("UBC") . . . 13. American Society for Testing and Materials[.]"  JX A1 at DEF0498470 (Section 2A.(1)(d)).

[23] Instead, Geolabs used a one-inch ring swell test, because "each locality tends to utilize a different test methods [sic] depending on their specialized local experience."  PX 147 at DEF0164414.  Ring swell tests are performed by taking soil samples, allowing them to air-dry for a period of time, such as overnight, and then saturating the dried samples at a specific pressure.  PX 69 at 00267.  Samples are measured when soil is dry and when it is saturated to determine how much the soil samples "swell."  The difference in the two measurements is expressed as a percent change and is the "swell value."  PX 69 at 00267.

In addition, Geolabs contended that its conclusions were supported by the fact that the demolished houses at the site were built in the 1960s had 12-18 inches of non-expansive fill under the slabs.  PX 147 at DEF0164414.

On June 1, 2004, Metcalf commenced work on the prototype pad changes, without a contract modification or any indication of when one might issue.  PX 161.  In addition, Metcalf proceeded on its own initiative to implement Geolabs' design recommendations and to over-excavate and import non-expansive fill, despite advice to the contrary from Metcalf employees with prior federal government contracting experience.  TR 1205-06, 1209-10, 1212-16 (Florez).  Metcalf's  CEO, however, decided, in light of the financial costs incurred while waiting for the Navy to act, Metcalf had no viable business option but to proceed.  TR 1492 (Metcalf).

On July 2, 2004, the Navy discussed whether to terminate Metcalf for default.  PX 171 at DEF0151299; 172 at DEF0224365; TR 423, 454 (Lee).  The Navy decided not to do so, but issued a letter of concern on September 27, 2004.  PX 211.

On August 5, 2004, the Navy again denied the existence of a differing site condition.  PX 194; TR 240 (Kimura testifying that the Navy only considered the reports of a Navy Geotechnical Engineer and the HIRATA REPORT).  The Navy did not ask Hirata to evaluate Geolabs' July 15, 2004 Report or otherwise consult Hirata.  TR 166 (Matsuura), 239-40 (Kimura), 1846-49 (Morimoto).  Instead, the Navy relied solely on a Navy Geotechnical Engineer's view that the expansion index utilized by Hirata and Geolabs produced consistent results.  PX 193; TR 1774-76 (Cheng).

On August 17, 2004, the Navy issued the change order for the prototypes.  JX E10. Thereafter, Metcalf submitted a design change for the pads to a post-tension design.  On January 19, 2005, the Navy approved this change.  PX 235.  Metcalf claims that the additional work to account for expansive soils entailed an actual cost of $4,831,776, without profit.  JX L4, Attachment B at 1.

### ii.     The Parties' Arguments.

Metcalf argues that it timely advised the Navy about the differing soil conditions on June 24, 2003 (PX 69).  The Navy, however, delayed in acting for fourteen months, during which time the Navy misrepresented that it was conducting an investigation whereas, in fact, the Navy was concerned about how to pay for these unexpected costs.  Pl. PT Br. at 63-67 (citing PX 169, 312, 317, 326, 330; TR 387 (Lee), 537 (Chun); Pl. Supp. PT Br. at 3-6 (citing TR 266 (Kimura)).  In addition, Metcalf argues that the Navy's ultimate and untimely rejection of Metcalf's changed site conditions claim was erroneous, because the expansive soil conditions that Metcalf encountered differed materially from the conditions described in the HIRATA REPORT, on which Metcalf reasonably relied.  Pl. PT Br. at 73-85.  As for the disclaimer in the HIRATA REPORT that it was "for information only," Metcalf asserts that, as a matter of law, broad exculpatory clauses cannot be used to circumvent a contractor's right to request an adjustment for differing site conditions.  *See United Contractors* v. *United States*, 368 F.2d 585, 598 (Ct. Cl. 1966) ("[B]road exculpatory clauses . . cannot be given their full literal reach and 'do not relieve the [Government] of liability for changed conditions as the broad language thereof would seem to indicate.'" (*quoting Fehlhaber Corp* v. *United States*, 151 F. Supp. 817, 825 (Ct. Cl. 1957))). Moreover, as, the Navy specifically stated during an April 27, 2001 Q & A session about the RFP, any "major disparit[ies regarding soil conditions] from the Government's soil reconnaissance report" would be dealt with via a change order.  PX 44 at 4; TR 242-43

(Kimura).  Therefore, the Navy interfered with the implementation of Geolabs' design and, on August 5, 2004, improperly denied the existence of a differing site condition.  Pl. PT Br. at 43-72; Pl. PT Reply. at 11-17.  Metcalf points out that no evidence contradicted the views of Robin Lim, Geolabs' Vice President, that expansion tests traditionally are not used in Hawaii, but instead, "ring swell tests" are used.  TR 1063, 1065, 1109, 1139 (Lim); TR 1820, 1837-38 (Morimoto).  In any event, Metcalf argues that whether an expansion test or ring swell test was utilized, a "special design consideration" was required to address the expansive soil situation.  PX 30 at Section 1803.2; PX 182 at 5 & plate A-10; TR 1111-12 (Lim); TR 1795-97 (Cheng).

The Government responds that any delays were attributable to Metcalf, not the Navy.  Gov't PT Br. at 23-33.  Metcalf's June 24, 2003 letter was not a formal notice of differing site conditions and, in any event, was tardy because it came a month before the deadline for final design approval.  Gov't PT Br. at 23-24 (citing TR 1573 (Borengasser)).  Thereafter, Metcalf did not provide a formal request to the Navy for over 100 days.  Gov't PT Br. at 28-30; TR 2069-70 (Stynchcomb).  More importantly, in fact, there was no changed site condition.  Gov't PT Br. at 12-22.  The HIRATA REPORT specifically advised contractors it was "for preliminary information only."  JX A1 at DEF0498474.  Therefore, Metcalf could not reasonably rely upon it.  *See Comtrol, Inc.* v. *U.S.*, 294 F.3d at 1357, 1367 at 1363 (Fed. Cir. 2002) ("Because the contract made no specific representation as to the type of soil to be encountered, it cannot be said that [the contractor] encountered conditions materially differing from those specifically indicated in the specification.").  Likewise, the transcript of the Q & A session, as incorporated into the Contract, expressly provided that "[t]he RFP remains unchanged unless it is amended in writing on a Standard Form 30," which did not occur here.  JX D1 at DEF0063552.  Finally, the HIRATA REPORT provided that the use of post-tension slabs was an option at the site and the test results were consistent with the higher expansion index verified by Geolabs.  Gov't PT Supp. Br. at 7-8.

### iii.    The Court's Resolution.

FAR 52.236-2(a) (Differing Site Conditions) requires a contractor to "*promptly, and before the conditions are disturbed, give a written notice* to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract." 48 C.F.R. § 52.236-2(a) (emphasis added).

FAR 52.236-2(a)(1) further provides that a differing site condition may exist where there are "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract[.]"  48 C.F.R. § 52.236-2(a)(1).  FAR 52.236-2(b) also requires that "[t]he Contracting Officer . . . investigate the site conditions promptly after receiving the notice" of a differing site condition.  48 C.F.R. § 52.236-2(b).  All of these FAR provisions were incorporated into the Contract.  JX A1 at DEF0498429; JX D1 at DEF0063575, DEF0063709.

On June 24, 2003, Metcalf sent a letter to the Navy of a differing site condition, attaching a copy of Geolabs June 20, 2003 Field Exploration Report.  PX 69.  The court has determined that this letter provided the Navy with notice of a differing site condition, because "notice need not follow any specific format, but must merely make the Contracting Officer aware of the differing site condition."  *Ace Constructors, Inc.* v. *United States*, 70 Fed. Cl. 253, 273 (2006); *see also Appeal of T & B Builders, Inc.*, ENGBCA No. 3664, 77-2 BCA P 12663 (1977)

("Notice under the differing site condition provision of the contract requires no precise formula. The obligation to give notice is discharged when a contractor makes the government representatives aware that he is encountering either subsurface or latent physical conditions at the site differing from those indicated in the contract[.]").

On October 27, 2003, Metcalf forwarded the updated GEOLABS REPORT to the Navy. PX 92. On January 21, 2004, Weidig Geoanalysts also was engaged by Metcalf to test Geolabs's findings as to whether the construction site's soils were highly expansive, thereby requiring special design consideration. PX 116. On July 15, 2004, Metcalf transmitted to the Navy the results of the additional testing conducted by Geolabs, as well as a letter from a fourth geotechnical engineering firm, Stewart Engineering, Inc., that "generally agree[ed] with Geolabs['] evaluation of the on-site soils [i]n question as 'moderately to highly expansive' and strongly disagree[ing] with the Hirata characterization of these soils as having a 'slight expansion potential'." PX 182. The Navy did not deny the existence of the differing site condition until August 5, 2004 (PX 194), *i.e.*, almost fourteen months after Metcalf provided the Navy with the initial June 24, 2003 notice of a differing site condition. PX 194.

For this reason, the court has determined that the Navy's failure to investigate the substantial differences regarding the soil conditions on a prompt basis violated FAR 52.236-2(b). *See J.D. Hedin Constr. Co.* v. *United States*, 347 F.2d 235, 253 (Ct. Cl. 1965) ("It took the contracting officer almost a year to [investigate the changed condition or correct the faulty design and issue change orders where appropriate]. Under such circumstances, we conclude that [the Government] breached its ever-present obligation to carry out its contractual duties within a reasonable time.")*, overruled by statute on other grounds as recognized by Wilner* v. *United States*, 24 F.3d 1397, 1402 (Fed. Cir. 1994). Accordingly, Metcalf is entitled to a 306-day extension, *i.e.*, from June 24, 2003, the date of Metcalf's letter of notice to the Navy (PX 69), until August 5, 2004, the date on which the Navy denied Metcalf's request. PX 194.

As to the merits of Metcalf's differing site condition claim, however, the court reaches a different conclusion. In *Int'l Tech. Corp.* v. *Winter*, 523 F.3d 1341 (Fed. Cir. 2008), the United States Court of Appeals for the Federal Circuit held:

> [T]o prevail on . . . a site conditions claim, a contractor must establish four elements. First, the contractor must prove that a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions. . . .;

> Second, the contractor must prove that the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents, i.e., that the contractor "reasonably relied" on the representations. . . .;

> Third, the contractor must prove that the particular contractor in fact relied on the contract representation. . . .;

Fourth, the contractor must prove that the conditions differed materially from those represented and that the contractor suffered damages as a result.

*Id*. at 1348-49 (internal citations omitted).

Metcalf did not satisfy the first element of the *International Tech* test, because the Contract required Metcalf to conduct an independent soil analysis. JX A1 at DEF0498474. Therefore, Metcalf was on notice that it could not rely on the "information only" HIRATA REPORT.

The second *International Tech.* element requires that the conditions actually encountered by the contractor were not reasonably foreseeable, based on all the information available at the time of bidding. As an established contractor in Hawaii, Metcalf would be aware of the problem of expansive soils. TR 1020, 1032, 1065 (Lim discussing presence of expansive soils in Hawaii); TR 967, 971, 973, 986, 991-92, 1154-58 (Lim discussing the problems created by expansive soil at the nearby Hunt Project). In fact, it appears that Metcalf was aware of the soil expansion issue at the nearby Hunt Project prior to entering into the Contract. TR 969-73 (Dozier testifying that the damage to the Hunt Project from soil expansion was known in 2000 to 2003 and repaired in 2004 to 2006); TR 1463 (Metcalf testifying about Hunt Project).

As to reliance, the third *International Tech.* element, Paragraph 2D.1 (a) of the RFP instructed bidders to review the HIRATA REPORT for "site preparation, foundation support, footing, slab and reinforcement requirements." JX A1 at DEF0498516. But, Paragraph 2B.1 (c) of the RFP required Metcalf to engage a Geotechnical Engineer to prepare an independent report of subsurface conditions and recommendations for the design of the project. JX A1 at DEF0498474. In other words, Metcalf could rely on the HIRATA REPORT for bidding purposes, but the Navy advised all potential contractors that they could not rely on the HIRATA REPORT in performing the 212 Project.

As to the fourth *International Tech.* element, *i.e.*, whether conditions at the site differed materially from those represented, the discovery of expansive soils at the construction site was a material difference from the HIRATA REPORT, but Metcalf was on notice of this potential.

For these reasons, the court has determined that the Navy violated FAR 52.236-2(b), a term of the Contract by failing to promptly investigate Metcalf's June 24, 2003 notice of a differing site condition. Although Metcalf incurred additional direct costs of approximately $4.8 million to address the expansive soils issue, the Government is not obligated, as a matter of law, for these costs as a differing site condition claim. *See Int'l Tech.*, 523 F.3d at 1348-49. Metcalf, however, is entitled to be credited for a 306-day extension.

    **c.**    **The Navy "Downplayed Chlordane [Contamination]" And Provided Plaintiffs With "Conflicting Directives" Regarding Remediation And Management (First Am. Compl. ¶¶ 72-87).**

    **i.**    **Relevant Facts.**

In 1988, the Environmental Protection Agency banned the use of chlordane, because it was a human carcinogen.  TR 340 (Lee).[24]  The RFP stated that: "Chlordane is present in the soils around the building foundation.  Remediation actions are not required since the levels are acceptable."  JX A1 at DEF0498469 (Section 2A.1 (c)(23)).  The RFP also informed contractors that soil with less than 3.78 parts per mission (ppm) could be used by the contractor.  JX A1 DEF0498725; *see also* PX 303 (the Navy advising Metcalf on August 4, 2005 that any soil with chlordane levels less of than 3.78 ppm could be reused and soil with levels over 3.78 ppm could be used under concrete or pavement or disposed of off-site).  On March 1, 2001, a Hazardous Materials Sampling Report conducted by EnvironMETeo Services, Inc. (the "EMET Report") stated that, because of "the extensive historical use of chlordane as a termite treatment in older military housing, chlordane is assumed to be present within the proposed project site."  JX A1 at DEF0498734 (RFP Appendix C - EMET Report).

On November 1, 2001, EMET found no detectable amounts of chlordane in four soil samples taken at the construction site of the 212 Project, but "recommended that the remaining residential units not previously assessed as part of this survey be tested for chlordane."  JX A1 at DEF0498734 (RFP Appendix C – EMET Report).

During the post-RFP and pre-final proposal period, in response to Notice No. 1, Question 15 was asked and answered, as follows:

Q.15: Page 2B-1, Para. 2B.1.c Contractor Soil Investigation Report. This requires an independent investigation after award.  The last two sentences state 'submit in writing proposed or requested changes to the Government requirements with appropriate technical data.  Changes are subject to approval by the Contracting Officer'. Should we infer from this that *any unforeseen soil conditions or variances from the Government's soils report will be dealt with by change order*?

Answer:  *Yes*, if there's a major dispute from the Government's soil reconnaissance report.

JX C1 at DEF0063555 (emphasis added).

---

[24] Chlordane/Heptachlor Termiticides; Notification of Cancellation and Amendment of Existing Stocks Determination, 53 FED. REG. 11798, 11798 (April 8, 1988) ("[I]t shall be unlawful for any person to distribute, sell, offer for sale, hold for sale, deliver for shipment, or receive (and having so received) deliver or offer to deliver to any person, or to make commercial use or commercial application of [Chlordane/Heptachlor], after April 14, 1988.").

In addition, in response to Notice No. 3, Question 34 also was asked and answered, as follows:

Q34: Does the Navy have any requirements for removal of the Chlordane contaminated soil, shown on the environmental survey?  For example, if homes are built over the contaminated area or will the Navy require removal of the Chlordane?

Answer: *No* remediation[25] action of the Chlordane contaminated soil is required, per Part 2, page 2A-4, paragraph 23.

JX D1 at DEF0063539 (emphasis added).

Taking these comments into account, on August 19, 2003, the Navy issued a Contract Site Specification that stated:

1.17.1 Chlordane Control Area Requirements

Establish a chlordane control area by completely enclosing/roping-off the area or structure where chlordane-contaminated soil excavation, removal and disposal operations will be performed. . . .

1.20.1 Work Performance . . .

Dispose of off-site, cover with 150 mm of clean topsoil or reuse under building concrete slabs, soil with chlordane content of 1.6 ppm or greater. For off-site soil disposal, perform the Toxicity Characteristic Leaching Procedure Test (TCLP Test); TCLP test result equal to or greater than 0.03 ppm for chlordane shall be handled and disposed of as hazardous waste. . . .

1.21.3 Testing of Chlordane-Contaminated Soil

Potential chlordane-contaminated soil shall be tested for chlordane and retested in areas that will not be paved or covered by building structure slabs for the presence of chlordane. . . .

---

[25] "Remediation" is not defined in the RFP.  The Resident Officer In Charge of Construction ("ROICC") testified that "[The Navy] interpreted remediation as having to clean the soil, meaning take a . . . piece of equipment that uses high temperature steam to remediate the soil to leach the Clordane [sic] out of the soil."  TR 361 (Lee).  In addition, a civilian Project Design Engineer employed by NAVFAC testified that "keep remediation" meant that there was no special hauling, disposing, removing, or burying.  TR 271 (Kimura).  In other words, the Navy considered removing or burying soil to deal with the chlordane to be remediation.

1.21.6 Soil Clearance Sampling

After removal of contaminated soils, test underlying soils for residual chlordane concentrations.  If concentrations exceed 1.6 ppm, additional materials shall be excavated until a clean layer is reached.

JX H at DEF0019963-65 (Contract Site Specification-Section 02095).

In August-November 2003, Metcalf conducted the required testing, but found no detectable levels of chlordane.  PX 83 at 2 ("chlordane results . . . show that no chlordane was found to be present in any of the composite soil samples collected; therefore, chlordane is not a concern.").  During this time, Metcalf began over-excavation of building pads to address the expansive soil issue, but later faced running out of space to store the soil.  TR 1375 (Oellien).  The RFP provided that the contractor would be given access to the Base landfill, but after Metcalf began work at the site, the landfill was closed.  JX A1 at DEF0498469; TR 1375-76 (Oellien).  Therefore, around April of 2005, Metcalf began to move the extra soil and place it under the site of a proposed basketball court.  PX 271 at DEF0144791.  The Navy, however, decided to require Metcalf to test the stockpiles for chlordane before proceeding.  PX 271 at DEF0144792; TR 272-74 (Kimura).

On July 22, 2005, Kauai Environmental, Inc. ("KEI"), collected and tested fifteen new samples from the soil stockpiles and the landscaped areas at the worksite.  PX 296 at 3.  KEI found detectable levels of chlordane ranging from 0.4-3.4 ppm in all fifteen samples and so informed the Navy.  PX 296 at 4.

On August 1, 2005, Metcalf submitted a letter notifying the CO of a Differing Site Condition citing the results of KEI's chlordane testing and requested approval for further action.  PX 308; JX D1 at DEF0063709 (The Award Document-Part 1, Attachment G, FAR 52.236-2 "DIFFERING SITE CONDITIONS (APR 1984)" ("The Contractor shall promptly . . . give a written notice to the Contracting Officer of . . . physical conditions at the site which differ materially from those indicated in this contract . . . The Contracting Officer shall investigate the site conditions promptly after receiving notice.")).

On August 2, 2005, Captain William Grip, Executive Officer at NAVFAC, instructed LCDR Lee to "draft up an official response as a pre-emptive strike . . . . tell [Metcalf] the mitigation issue is theirs[.]"  PX 301 at DEF0329155.  On August 4, 2005, LCDR Lee informed Metcalf that the Navy did not believe that "your discovery of chlordane in the soil is justification for a changed condition."  PX 303 at 3; TR 659-60 (Chun).  Metcalf was advised, however, that in accordance with EPA guidelines, soil with chlordane levels of less than 3.78 ppm could be reused and soil with levels over 3.78 ppm could be placed under concrete or pavement or disposed of off-site.  PX 303 at 1.  But, the Navy also cited site specification section 02095 requiring Metcalf to: conduct chlordane testing (paragraph 1.21.3); remove contaminated soil (paragraph 1.21.6); and perform required toxicity soils testing (paragraph 1.20.1), without a change order for additional time or money.  PX 303 at 2; *see also* JX H at DEF0019964-65 (Contract Site Specification-Section 02095).

On August 3, 2005, Metcalf hired EMET to take twenty additional samples from the same soil stockpile locations as KEI's samples were taken. PX 306 at 1. EMET's results were "generally similar . . . [but showed a level] slightly higher in Chlordane" than KEI's samples. PX 306 at 3; *see also id.* at 2-3 (results ranged from 0.38-10.7 ppm). All but three samples were above the limits set by the EPA's Preliminary Remediation Goals. *See* PX 306 at 2-3.[26]

On August 16, 2005, Metcalf sent the Navy a second Notice Of A Differing Site Condition, indicating that the required "remediation . . . and the costs of such remediation will be significant." PX 308 at 3; *see also* TR 346, 358 (Lee).

On August 19, 2005, the Navy responded that "treating or restoring the soil to a certain cleaned percentage level, is not required." PX 309 at 1. Moreover, the Navy emphasized that Metcalf was responsible "to manage the disposition of the soil in accordance with [Metcalf's] contract specification Section 02095." PX 309 at 2.

In mid-August 2005, the Navy contacted the Hawaii Department of Health ("HDOH") to ascertain what could be done with the contaminated soil. PX 310.

Around August 22, 2005, an Environmental Engineer at NAVFAC Pacific responsible for chlordane issues summarized a discussion with HDOH about paving over soil with a higher than 1.6 ppm or covering it with 6"-18" of clean soil. PX 311; *see also* TR 276-77 (Kimura). On August 23, 2005, he advised his Navy supervisors that "we may need to get creative" and possibly demolish some concrete slabs, over excavate, and deposit the impacted soils. PX 312 at DEF0142597.

On September 7, 2005, Metcalf notified the Navy that it planned to submit a claim, because the Navy's failure to resolve with HDOH how to deal with the chlordane was causing a delay in the critical path. PX 318.

On September, 9, 2005, KEI provided Metcalf with a Chlordane Contaminated Management Plan (the "KEI Chlordane Plan"). PX 319 at MET 020580. On September 14, 2005, the Navy also received a copy of this Plan. PX 319. The KEI Chlordane Plan first discussed the guidelines in the project specification (Section 02095) and the HDOH policies. PX 319 at MET 020382-83; JX H at DEF0019964 (Contract Site Specification- Section 02095, 1.20.1 Work Performance) (Section 02095 of the project specification providing that soil with 1.6 ppm chlordane concentration had to be disposed of off-site and covered with clean soil or reused under building concrete slabs.). The KEI Chlordane Plan recommended that Metcalf follow the HDOH rules requiring that soils containing chlordane at concentrations at or below 1.6 ppm be left in place.[27] PX 319 at MET 020383, 86. In October 2005, the Navy directed

---

[26] *See* Environmental Protection Agency, Preliminary Remediation Goals (Oct. 2004), *available at* http://www.epa.gov/region9/superfund/prg/files/04prgtable.pdf.

[27] Just a few years prior, the HDOH required that only six inches of clean fill be placed over chlordane contaminated soil. PX 319 at MET 020383. Under the new requirements, however, soil with chlordane concentrations in excess of 1.6 ppm "must be placed under a hardened surface or be removed from the site." PX 319 at MET 020383.

Metcalf to revise the KEI Chlordane Plan in a manner that Metcalf believed conflicted with more stringent state guidelines.  PX 336 at DEF0329706-08.

On August 31, 2005, the Navy sent an email to Mr. Murata, the Navy's "G4,"[28] acknowledging that, with the discovery of impacted soil and change in the HDOH guidelines, the Navy is "facing an *enormous change to the contract scope* that will require a contract modification."  PX 317 at DEF0145408 (emphasis added); *see also* PX 330 at DEF0469329 (estimating the additional cost at $4,332,000); TR 380-83, 387, 393-95 (Lee).  Nevertheless, the dispute between the Navy and Metcalf over financial responsibility for the required remediation continued into November 2005.  PX 353 at MET 021184.

On December 22, 2005, the Navy issued Modification A00017, directing Metcalf to use soil stockpiles in the 212 Project, with the exception of piles in two areas that were to remain in place, but undergo weed eradication.  PX 353; JX E20 at DEF0064612.

On December 21, 2005, the Navy informed Metcalf that a chlordane level of 32 ppm in the soil was acceptable for the 212 Project.  PX 358 at FED0146844.

## ii.        The Parties' Arguments.

Metcalf argues that the Contract provided that chlordane remediation was not required. Pl. PT Br. at 111 ("Chlordane is present in the soils around the building foundations. *Remediation actions are not required* since the levels are appropriate." (quoting JX A1 at DEF0498469) (emphasis added by Plaintiff)); *see also* JX A1 at DEF0498725 (stating that any soils containing chlordane in concentration less than 3.78 parts per million (ppm) could be used by the contractor); JXA1 at DEF0498734 (stating that other residential units, not previously assessed, however, should be tested for chlordane).  Metcalf conducted additional tests in August-November 2003, but no detectable levels of chlordane requiring remediation were reported.  PX 83, 98.  The subsequent discovery of chlordane in the soil stockpiles was not Metcalf's fault.  Although the Navy reimbursed Metcalf for most of the associated costs (PX 312, 326, 330; TR 387 (Lee)), Metcalf was not paid for $502,227 to remediate chlordane found in the soil stockpiles, primarily because of funding issues.  JX L4, Att. B at PX967855. Moreover, if Metcalf had known of the chlordane situation in 2003, instead of 2005, it would have had "more options" and "more time" to deal with the "disposal," "treatment," and "movement" of the chlordane.  Pl. PT. Br at 1 (citing TR 885 (Chun)).

The Government responds that Metcalf failed to meet any of the elements of *International Tech*.  In addition, there is no evidence that the Navy took any action regarding chlordane to re-appropriate the benefits that Metcalf expected to obtain from the 212 Project. Gov't PT Br. at 44-46.  More importantly, the Navy voluntarily compensated Metcalf for the chlordane situation, but not for costs associated with Metcalf's failure to "manage the stockpiles of soil materials that were impacted by C[h]lordane just around the building pads and not consolidated it with the grading material from all over the site. . . . [I]f  they would have

---

[28] The "G4" is the top Marine Corps official in charge of Hawaii base logistics, facilities, and supplies.  TR 375 (Lee).

managed the material that was around each building pad, the soil material impacted by C[h]lordane would have been . . . much less." TR 350-51 (Lee).

### iii.     The Court's Resolution.

Pursuant to the first *International Tech.* element, the court must ascertain whether Metcalf reasonably could interpret the Contract to require chlordane remediation at the 212 Project site.  The RFP represented the existence of chlordane, but that the known levels were acceptable so that "[r]emediation actions are not required[.]"  JX A1 at DEF0498469; *see also* JX D1 at DEF0063539 (Navy confirming at the pre-bid conference that no remediation was required).  The March 1, 2001 EMET Report, however, advised Metcalf of the need to conduct an independent assessment.  JX A1 at DEF0498734, RFP Appendix B-EMET Report (discussing requirement for an independent soil investigation); *see also* JX A1 at DEF0498474; JX D1 at DEF0063555 (same).  As such, Metcalf could not rely on the Contract and was on notice to seek more information.

Next, the court must determine whether it was reasonably foreseeable to Metcalf that higher chlordane levels might be discovered.  Contract Specification-Section 02095 stated that soil with chlordane concentrations in excess of 1.6 pp could be present and it instructed Metcalf, if such chlordane levels were found, the affected soil must be "[d]ispos[ed] of off-site, cover[ed] with 150mm of clean topsoil or reuse[d] under building concrete slabs[.]"  JX H at DEF0019964.  Therefore, it was reasonably foreseeable that higher levels of chlordane could be present and need remediation, so that Metcalf could not have reasonably relied on general representations to the contrary.  In any event, by August 8, 2005, the date of EMET's verification of KEI's tests (PX 306 at 25), it was Metcalf's contractual responsibility to undertake the necessary storage and/or remediation of chlordane soil required to meet federal and state environmental requirements.  JX 1 at DEF0498612 (requiring contractor to "[c]omply with federal, state, and local regulations pertaining to the environment").

Finally, the Navy paid Metcalf $1,493,103[29] and afforded Metcalf a 286-day extension[30] to address the chlordane situation.  Each of these aforementioned bilateral modifications released the Navy from any and all other claims.  *See* JX E17 at DEF0064603.  Nor is there any evidence in this record that the Metcalf was under duress in agreeing to those terms.  *See Rumsfeld* v. *Freedom NY, Inc.*, 329 F.3d 1320, 1330 (Fed. Cir. 2003) (holding that "[e]conomic pressure and even the threat of considerable financial loss are not duress." (quoting *Johnson, Drake & Piper Inc.* v. *United States*, 531 F.2d 1037, 1042 (1976)).

For these reasons, the court has determined that the Navy did not breach the Contract nor the duty of good faith and fair dealing regarding the required chlordane remediation.[31]

---

[29] JX E17, 19, 20, 22, 24, 26, 29.

[30] JX E19, 25, 26.

[31] It is true that the Navy did not provide Metcalf access to the base landfill and it took some time to find a remediation plan that satisfied the State of Hawaii's regulatory authorities.

>    **d.**    **The Navy "Interfer[ed]" With Plaintiff's "Contemplated Design Revisions" and "Construction Means And Methods" (First Am. Compl. ¶ 88).**

>        **i.**    **Relevant Facts.**

The RFP states that the purpose of the 212 Project was "to complete the design and construct" family housing facilities, and details the description of the "design and construct" criteria for the site design and engineering (Section 2B), the buildings' design (Section 2C), and the building engineering, material, quality and maintenance (Section 2D).   JX A1 at DEF0498466, DEF0498474-540.  In addition, the contractor was required to be responsible for "the professional quality, technical accuracy, and the coordination of drawings, specifications, and other design services . . . [and] without additional compensation, [to] correct or revise any errors[.]"   JX A1 at DEF0498592.  The contractor also was required to "[s]ubmit [a] design quality control plan [to the Navy]."  JX A1 at DEF0498592.

>        **ii.**    **The Parties' Arguments.**

Metcalf argues that "contract requirements" did not include Metcalf's "design construction" and "specifications and drawings," but rather the specific documents listed in the RFP comprising the Contract.  Pl. PT Br. at 103-105 (listing contractual documents as: the performance bond, payment bond, subcontracting plan, Guide to Participating for Government Contracts, FAR 52.202-52.228 and FAR 52.229-52.253; RFP No. N62742-00R-1345, and a State of Hawaii General Wage Decision No. H101000001); *see* JX A1 at DEF0498347; *see also* JX A1 at DEF0498564 (requirement for obtaining a variation from contract requirements).  As such, Metcalf's "design" was not a "contract requirement."  TR 1194-95 (Florez).  Therefore, the Navy's requirement that Metcalf submit design changes, for prior approval, for a design-build housing project breached the Contract and breached the duty of good faith and fair dealing, by requiring that the Navy approve Metcalf's designs.  Pl. PT Br. at 103-04.

Metcalf also argues that the Navy unreasonably denied Metcalf's requests for a variation for the design of riser conduits and manhole cable racks.  Pl. PT Br. at 108-111.  On October 23, 2003 and November 8, 2004, Metcalf submitted variance requests to the Navy for approval of minor design changes that would make Metcalf's work easier and improve the quality of the overall project.  PX 90 (variance request for manhole cable racks); PX 228 (variance request for conduit stub-ups).  The Navy, however, unreasonably denied Metcalf's requests and undermined Metcalf's "prerogative as the design-builder."  Pl. PT Br. at 110.  Although Metcalf recognized that "the Navy had the contractual right to deny Metcalf's variance request[s], the rejection[s] w[ere] clearly not in the spirit of partnering and cooperation."  Pl. PT Br. at 110 n.45.

---

The Navy had no control over the State regulatory authorities and Metcalf failed to specify the price the Navy should pay for not providing access to its landfill.

The Government responds that the Contract required Metcalf to follow the plans and specifications submitted to the Navy, unless Metcalf sought and obtained a written variance. Gov't PT Br. at 40-43.

### iii.   The Court's Resolution.

Numerous provisions in the Contract require that, once the Navy approved Metcalf's plans and specifications, Metcalf was obligated to construct the 212 Project without any deviation, unless the Navy issued a variance "approved in writing[.]"   JX A1 at DEF0498372; *see also id.* at DEF0498564 ("Variations from contract requirements require Government approval pursuant to the Contract Clause entitled 'Specifications and Drawings for Construction[.]'"); *id.* at DEF0498371 ("Final design submissions found to be incomplete or not in compliance with the contract will be returned to [Metcalf] for correction and resubmission.").

Metcalf's failure to appreciate the difference between the contractor's ability to make changes in the private design-build context and the contractual constraints necessarily required in government contract work lies at the heart of this dispute.  The Navy's insistence that Metcalf adhere to contractual requirements, that Metcalf deemed to interfere with the superior judgment of an experienced design-build contractor, was within the Navy's contractual rights.

For this reason, the court has determined that the Navy's request that Metcalf seek prior approval of construction changes neither was neither a breach of contract nor a breach of the duty of good faith and fair dealing.

### e.   The Navy "Overcomplicat[ed] Certain Simple Repairs," "Overinspect[ed] . . . Work," "Hassl[ed] Subcontractors Concerning Performance Qualifications," "Misinterpret[ed] Provisions Of The Contract" And "Applicable Industry Codes," And "Provid[ed] Untimely Notice Of Baseless Concerns About Work . . . In Place." (First Am. Compl. ¶ 88).

### i.   Relevant Facts.

On or around June 30, 2004, shortly after a "partnering session" designed to facilitate better communications, Metcalf was pouring a concrete slab and asked Mr. Takayesu, the Navy Inspector assigned to the 212 Project, if the slab "was acceptable."  TR 1451-52 (Metcalf). Takayesu replied that it was, but later filed a notice of non-compliance.  TR 1451-52; PX 168; *see also* PX 178.

In September 2004, the same Navy Inspector also issued a notice of non-compliance to Precision Electric ("Precision"), a Metcalf subcontractor, for using insulated "service entrance" temporary power cables that nominally complied with the National Electric Code.  PX 213; TR 1317-19 (Schenk).

This same Navy Inspector also conducted most of the final inspections of completed units that Metcalf considered to be intrusive or failed to follow industry standards.  TR 1165

(Fattorosi).  For example, this Inspector refused to test blinds, if the cords were looped up.  TR 641 (Chun).  In addition, he rejected a countertop that was 1/64 inch outside of specifications, but told Metcalf employees that "on any other job in the universe, he would not only accept [the] countertop but that it actually looked good. . . . [U]nfortunately this is a war . . . no breaks."  PX 427 at DEF EXP037474

In an undated email, a Family Housing Department Inspector with the Marine Corps who participated in the final inspections, observed in an e-mail to his supervisors that the inspections "do[] not seem right legally," because Inspector Takayesu continues to identify new problems "running two and three [finals] after the initial acceptance inspection and follow-up."  PX 426; *see also* TR 977-89 (Dozier).  Inspector Takayesu's conduct was characterized as "harassment."  TR 990 (Dozier).

In response to an April 28, 2006 letter from Metcalf raising concerns about Inspector Takayesu, the Navy conducted an informal investigation, but concluded, based on interviews and other "information gathered," that he "was not in violation of any regulation or law."  DX 2847.

### ii.      The Parties' Arguments.

Metcalf's primary argument focused on the turnover inspection process, where Mr. Takayesu emerges as a central character.  PT Br. at 149-55.[32]

The Government responds that a subsequent investigation conducted by Captain Grip did not substantiate complaints about Mr. Takayesu.  Gov't PT Br. at 58-60.

### iii.      The Court's Resolution.

Metcalf does not cite any provision of the Contract that the Navy violated in conducting the inspection turnover process.  The record establishes that Mr. Takayesu was a difficult and overzealous Navy employee and that there was a retaliatory aspect to some of the non-compliance notices that the Navy issued.  Nevertheless, the court has determined that collectively, these actions do not rise to the level of a breach of the duty of good faith and fair dealing, particularly since the Navy was under pressure to move service members into private housing.  TR 987 (Dozier).  *See Precision Pine*, 596 F.3d at 829 (observing that "[n]ot all misbehavior . . . breaches the implied duty of good faith and fair dealing").

---

[32] Metcalf also argued that a series of non-compliance notices generated by Mr. James Merriman, who later was asked to leave Metcalf in 2005, and those issued by the Navy in retaliation for Metcalf's requesting that a Congressman visit the 212 Project had no merit.  PT Br. at 152  (citing TR 683-84, 954-55 (Chun); PX 24).

> **f.**   **The Navy "Arbitrarily Reject[ed] Submittals [Of Proposed Personnel]" (First Am. Compl ¶ 88).**
>
> **i.**   **Relevant Facts.**

The RFP stated:

> The Contractor shall provide complete resumes for proposed substitutes, and any additional information requested by the Contracting Officer.  Proposed substitutes should have *comparable qualifications* to those of the persons being replaced.

JX A1 at DEF0498380 (emphasis added).

The Navy rejected several of Metcalf's proposed Project Managers.  Mr. Charles Strickland, the Project Manager retained when the initial July 26, 2002 proposal was submitted, left Metcalf before the performance commenced on December 31, 2002.  TR 699-700 (Chun). His replacement, Mr. Mike Danforth, started as Project Manager shortly before January 2003, but unexpectedly resigned in March 2003.  TR 700-02 (Chun).  Prior to his resignation, Mr. Danforth retained Edward J. Cass & Assoc. ("Cass") to conduct project design.  TR 705-06 (Chun).  Although no one formally served as Project Manager after Mr. Danforth's departure, James Oellien unofficially assumed that role until July 2003.  TR 723 (Chun); DX19 at DEF0009007; PD 1.  In July 2003 Metcalf was still negotiating with Cass to perform project design work.  TR 706-10 (Chun).

On July 14, 2003, Alex Causey was hired by Metcalf as a Project Manager.  DX 2863. On August 12, 2003, the Navy objected to Mr. Causey's qualifications because he lacked experience with "construction of similar dollar value/scope/complexity multi-family dwelling units[.]"  DX 19 at DEF0008982-83.  As a result of these initial personnel issues, the Navy did not approve Metcalf's initial project design until November 2003.  TR 713 (Chun).

In December 2003, Mr. Causey resigned from Metcalf.  PX 179, at DEF0438423, DEF0438427.  On January 5, 2004, Mr. Walter Chun, Metcalf's General Manager, stepped in as interim Project Manager.  PX 179 at DEF0438423, DEF0438427.  On January 27, 2004, Mr. Chun provided the Navy with the resume, of Mr. Nickolas Florez.  PX 179 at DEF0438423.  On February 10, 2004, Metcalf notified the Navy that Mr. Florez would be assuming the job of Project Manager.  PX 179 at DEF0438429.[33]

On April 15, 2004, however, the Navy also objected to the appointment of Mr. Florez stating that the "resume submitted for informal review for the project manager's position does not match favorably with that of Mr. Michael Danforth who was originally proposed in this

---

[33] The effective date of Mr. Florez's subcontracting agreement, however, was February 23, 2004 (DX 2869 at DEF0004653), but the Navy was not notified of this fact until March 5, 2004, when Metcalf copied the Navy on a letter appointing Mr. Florez as Project Manager.  PX 179 at DEF0438430; DX 02868 at DEF0009600.

capacity."[34]   PX 179, Att. 5 (DEF0438431-32).   The RFP requires that Metcalf "provide complete resumes for proposed substitutes" to the CO who then "will notify the Contractor within 15 days after receipt of all required information of the consent on substitutes."   JX D1 at DEF0063608 (RFP 1D.35 "SUBSTITUTION OF KEY PERSONNEL FAC 5252.237-9301 (JUNE 1994)"); *see also* PX 179 at DEF0438428 (same).   The Navy's "objections," however, were registered well after the 15 day commitment period, *e.g.*, 79 days after the Navy was provided with Mr. Florez's resume and 65 days after being notified that Mr. Florez asked to be the Project Manager.

On July 14, 2004, Metcalf's CEO demanded that the Navy to "approve my Project Manager, Nick Florez, and release the retentions being withheld."  PX 181.  Instead, on July 16, 2004, Metcalf relieved Mr. Florez of his duties.[35]  According to a July 16, 2004 letter Metcalf wrote to LCDR Lee, the termination "[met] the [Navy's] requirements to immediately release the $100,000 retention and to bring [Metcalf] into compliance with the contract."   PX 185. Contemporaneous internal Metcalf notes and memoranda, however, reflect that Mr. Florez was terminated for "non-compliance [with his contract] and inappropriate behavior," DX 159 at 4-8, and that Florez had a "bad reputation" and projected an unfavorable "image [of] the company . . . [t]reated employees and government representatives poorly creating a hostile environment . . . [and cost Metcalf] in excess of $500,000[.]"  DX 2675 (undated notes created for Terry Metcalf prior to a meeting with Mr. Florez that occurred after Mr. Florez's termination).

On July 16, 2004, Mr. Chun again took over as Metcalf's interim Project Manager.  PX 185.  In August 2004, James Oellien was hired as Project Manager.  TR 1375 (Oellien).

The Navy also rejected at least one of Metcalf's proposed Quality Control Managers ("QCM").  Metcalf's first QCM was Mr. Tony Vidal.  PD 1.  Mr. Vidal briefly was replaced by Ms. Kathy Ashely in August of 2003, and then by Mr. Jim Merriman in September, 2003.  PD 1.

---

[34] This court, however, finds that Mr. Florez's qualifications were similar to Mr. Danforth's qualifications.  *See* PX 179 at DEF0438424-26 (July 12, 2004 Metcalf chart comparing Mr. Danforth's and Mr. Florez's qualifications).  For example, Mr. Danforth had a B.S. in Civil Engineering; Mr. Florez had a B.S. and M.A. in Civil Engineering. Mr. Danforth had no professional registrations; Mr. Florez was a registered engineer-in-training. Mr. Danforth had managed projects up to $24 million in value; Mr. Florez managed projects up to $21 million. Mr. Danforth managed two military housing projects, valued at $12 million and $16 million; Mr. Florez managed three military housing projects, valued at $12 million, $7 million, and $6 million. Mr. Danforth had six years of experience managing military contracts; Mr. Florez had sixteen years of similar experience. Mr. Danforth had twenty-five years of construction experience; Mr. Florez had twenty-one years of construction experience.   PX 179 at DEF0438424-26.

[35] After Mr. Florez began as Project Manager issues also arose with Metcalf's General Manager.  DX 2918 at PX575312 (May 21, 2004 letter from Mr. Chun to Mr. Florez: "In the future we are going to have to find a better way to communicate and work together. . . . Professionally we have a different management style and approach to the project and we both need to accept that.  I am willing to work with you to find a middle ground[.]").

When Mr. Merriman left the position in March 2004, Metcalf sought to replace him with Mr. George Allen.  PX 140 at DEF0438431.  On April 15, 2004, the Navy rejected Mr. Allen because he did not have comparable experience to Mr. Vidal, *i.e.*, he lacked experience on projects of similar size and type.  PX 140 at DEF0438432.  Subsequently, in April 2004, Metcalf accepted LCDR Lee's suggestion that Mr. Jeff Palesano step into the QCM role (PD 1),[36] despite Metcalf's reservations that Mr. Palesano was unqualified.  TR 920-21 (Chun).  Mr. Palesano was terminated in September of 2004 and Mr. Merriman resumed the role of QCM.  PD 1; TR 599 (Chun).

### ii.     The Parties' Arguments.

Metcalf argues that the Navy's rejection of Messrs. Causey, Allen, and Florez individually and collectively violated the Contract and breached the duty of good faith and fair dealing.  Pl. PT Br. at 140-45.  The Contract only required that a substitution have "comparable" experience.    JX A1 at DEF0498380 ("Proposed substitutes should have comparable qualifications to those of the persons being replaced.").  This higher standard led the Navy improperly to reject qualified candidates that Metcalf proposed for the key positions of Project Manager and Quality Control Manager.  Pl. PT Br. at 142-45.  The CO, however, insisted that Metcalf's proposed substitutes have the *same* level of experience, or better, compared with the person he/she was replacing.  TR 151-52 (Matsuura).

The Navy responds that the rejections of Messrs. Causey and Allen were appropriate, because their credentials were not comparable to their predecessors.  Gov't PT Br. at 52-56.  In fact, Metcalf acknowledged that Mr. Causey "lacked residential construction experience."  Gov't PT Br. at 53 (quoting Pl. PT Br. at 142).  As to Mr. Allen, "Metcalf does not even attempt to demonstrate that [he] . . . possessed comparable qualifications to the quality control manager he was replacing, James Merriman."  Gov't PT Br. at 55 (citing Pl. PT Br. at 144-45).  Finally, as to Mr. Florez, Metcalf did not even file a *formal* request for him to be substituted until at least June 24, 2004.  DX 389 at PX649805.  Metcalf, however, decided to terminate Mr. Florez in July 2004 not because of the Navy's disapproval, but because of his job performance and conduct.  Gov't PT Br. at 54 (citing DX 159 at PX014596; DX 160, 2675; TR 1233 (Florez)).

### iii.     The Court's Resolution.

The Contract required Metcalf to provide "comparable" substitutions for key personnel who were replaced.  JX A1 at DEF0498380.  The Navy's CO testified that in determining whether a substitute was qualified, she assessed whether the substitute's qualifications were "similar or better."  TR 152 (Matsuura).  The court discerns no practical difference between the "similar" standard applied and the "comparable" standard called for in the Contract.  See AMERICAN HERITAGE DICTIONARY 37 (4th ed.) (2000) (defining "comparable" as "similar or equivalent").

---

[36] Plaintiff's Demonstrative Exhibit 1 ("PD 1") provides a timeline of the various Metcalf employees who served as Project Manager and Quality Control Manager over the course of Contract performance.

As to Mr. Causey, it is undisputed that he was an experienced project manager with government contracting experience building concrete works, fuel lines, and underground tunnels. TR 593 (Chun).  The Navy's CO, however, was entitled to conclude that his qualifications were not "comparable" to Mr. Danforth's in light of his lack of experience with the type of project undertaken here, *i.e.*, residential housing.  Second, as to Mr. Allen, Metcalf has made no effort to demonstrate that Navy erred in determining that Mr. Allen "does not demonstrate experience on similar size and type of construction contracts" as his predecessor.  PX 140 at DEF0438432.

Finally, as to Mr. Florez, contrary to the Government's argument, Metcalf provided the Navy with notice of its intent to substitute Mr. Florez via a February 10, 2004 email from Mr. Chun (PX 179 at DEF0438429), and copied the Navy on Mr. Florez's March 5, 2004 letter of appointment.  PX 179 at DEF0438430.  Nevertheless, internal Metcalf notes indicate that Mr. Florez was terminated for poor performance, rather than because of Navy's objections.  Moreover, Metcalf has not met its burden to show that Mr. Florez's rejection was undertaken with the purpose of interfering with Metcalf's performance.  *See Precision Pine*, 596 F.3d at 830 (holding there was no breach of the implied covenant of good faith and fair dealing where the Government's actions were not shown to have been "undertaken for the purpose of delaying or hampering [Plaintiff's] contracts").  Nor has Metcalf demonstrated that it suffered any specific injury attributable to the Navy's initial, wrongful refusal to allow Mr. Florez to serve as Project Manager.  *See Id.* at 829 ("The [G]overnment may be liable for damages when the [bad faith] government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction[.]").

Having made this determination, the court would be remiss if it did not state that the court was singularly unimpressed with the *bona fides* of CO Matsuura.  TR 117-219) (court examining Ms. Matsuura).  It is clear to the court that Ms. Matsuura's lack of knowledge and experience significantly contributed to the lack of trust and poor communication that plagued the 212 Project at the beginning.  It also appeared that other members of the Navy team actually were making the decisions, as best evidenced by the significant delay in promptly investigating the soil expansion issue.  Nevertheless, inexperience and even incompetence do not amount to a breach of good faith and fair dealing on the part of government employees.  *See Precision Pine*, 596 F.3d at 829 (observing that "[n]ot all misbehavior . . . breaches the implied duty of good faith and fair dealing").

For these reasons, the court has determined that the Navy's conduct regarding Messrs. Causey, Allen, and Florez did not breach the Contract nor constitute a breach of the implied covenant of good faith and fair dealing.

### g.     The Navy "Inconsistently Administer[ed] The Payment Process." (First Am Compl. ¶ 88).

### i.     Relevant Facts.

A series of events took place between July 2004 and May 2005 that Metcalf alleges went beyond a mere contractual violation to a breach of the duty of good faith and fair dealing.

On July 9, 2004, the Navy withheld $100,000 because it did not consider Mr. Florez to be an acceptable Project Manager.  PX 177; TR 603-04 (Chun).  On July 16, 2004, LCDR Lee offered to release this $100,000 retention if Metcalf would terminate Mr. Florez.  PX 185.  At trial, LCDR Lee characterized this as an act of "goodwill."  TR 414-15 (Lee).  LCDR Lee, however, was well aware that Metcalf was having cash-flow problems.  TR 405 (Lee).

On October 20, 2005, the Navy executed Modification A00014, JX E17, but the Navy was already withholding $1,756,367.  PX 273.  On May 27, 2005, Metcalf submitted a Certified Claim and Request For Final Decision to release this amount.  PX 274.  On July 25, 2005, the Navy acknowledged receipt of the Certified Claim, but indicated it may need four months, *i.e.*, until November 30, 2005, to issue a decision.  PX 293.  Thereafter, on August 2, 2005, the Navy confirmed it would not release this amount until a Final Decision was issued.  PX 300.

On June 13, 2005, Metcalf requested additional time and compensation to relocate telecommunications fiber optic cable.  PX 282.  On July 19, 2005, Metcalf revised and reduced the time requested.  PX 22d.  On July 26, 2005, the Navy issued a unilateral contract Modification A00013 that increased the contract price by $94,826 and reduced Metcalf's fiber optic cable claim and time requested by 133 days.  JX E16.  On August 8, 2005, Mr. Metcalf met with LCDR Lee to request release of the $1,756,367.  PX 307.  LCDR Lee advised Metcalf that there would be no release, unless Metcalf withdrew the May 27, 2005 Certified Claim.  PX 307.  On September 20, 2005, Mr. Metcalf again met with LCDR Lee to seek a release of those funds.  PX 322.  This time, LCDR Lee offered to release $1.25 million of the $1,756,367 at issue, but only if Metcalf withdrew the May 27, 2005 Certified Claim *and* agreed to a total time extension of 95 days, instead of the 210 requested, and no compensation for the fiber optic cable work.  PX 322 at 2.  Metcalf agreed to these terms.  JX E 17 at DEF0064603.

### ii.    The Parties' Arguments.

Metcalf argues that the Navy's actions, withholding earned progress payments and retention, amounted to extortion.  Pl. PT Br. at 144, 155-59.

The Government responds that Metcalf failed to proffer any evidence of "extortion."[37] Gov't PT Br. at 60.  Instead, the Navy withheld funds for legitimate reasons.  Gov't PT Br. at 60-61.

Instead, as Captain Grip testified,

Retention is a tool that is available to the Contracting Officer to use in cases where a contract is behind in schedule or has contract compliance issues like safely or quality control.

---

[37] 18 U.S.C. § 1951(b)(2) defines "extortion" as the "obtaining of property from another, without his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

> The intent behind retention is to protect the government's interests in that if the work isn't done in compliance or isn't done in eventuality, the sum amount of the monies is intended to cover the amount of effort or the amount of funds required to execute the work without increasing contract costs.

TR 2601 (Grip); *see also* TR 405-07, 414-15, 483-84 (Lee); PX 377; DX 4002 at DEF0011406 ("The current payment retention of $500K is fully justified in view of your performance thus far[.]").

This was what happened with Metcalf. DX 4004 (email exchange between Terry Metcalf and Capt. Grip discussing retention of funds); DX 4007 (email exchange between Capt. Grip and LCDR Lee regarding Metcalf's poor performance). Moreover, the Government asserts that, because the Navy was concerned about completing the 212 Project, it "went out of its way" to keep Metcalf financially viable. TR 2594-95, 2607-08 (Grip); DX 2566.

### iii. The Court's Resolution.

The court has determined that the Navy held Metcalf to the requirements of the Contract, irrespective of the adverse financial impact on Metcalf. In doing so, the Navy placed the financial interest of the public before Metcalf. No doubt, this hard-nosed attitude required Metcalf to compromise its bargaining position, but not Metcalf's substantive rights, as best evidenced by this proceeding. Metcalf voluntarily assumed the financial responsibility for completing the 212 Project, despite the fact that it appeared to be undercapitalized at critical junctures. To be sure, the expansive soil and chlordane situations presented Metcalf with challenging construction and associated financial issues, but Metcalf was an experienced contractor in Hawaii, so that neither of these situations should have been unexpected, contrary to Metcalf's litigation-driven interpretation of the Contract.

Based on the contract's explicit requirements, the court has determined that the Navy did not "[e]xtort[] Metcalf by [w]ithholding [e]arned [p]rogress [p]ayments and [r]etention for [i]mproper [r]easons." Pl. PT Br. at 155.

### h. The Navy "Enforc[ed,] In An Abusive Manner[,] The Safety Program Employed Metcalf." (First Am. Compl. ¶ 88).

### i. Relevant Facts.

The Contract provides: "The work under this contract is dangerous. Pursuant to the additional measured requirement of the Contract Clause entitled 'Accident Prevention,' submit in writing proposals for effectuating accident prevention and meet with the [CO] to discuss and develop a mutual understanding relative to the administration of the overall safety program." JX A1 at DEF0498378; *see also id.* at DEF0498560-562 (identifying importance of safety). Therefore, Metcalf was required to document "job safety actions taken and safety inspections conducted." *Id.* at DEF0498575.

### ii.      The Parties' Arguments.

Metcalf argues that the Navy continually interfered with progress on the 212 Project by raising safety issues that either were not safety violations or were blown out of proportion.  Pl. PT Br. at 145-47.  As a result, the Navy's actions "created . . . bad morale out at the work site" and "took up a lot of [Metcalf's] time to go and research or investigate each one of these things and then find out that it wasn't an issue."  TR at 577 (Chun).  In addition, the Navy insisted on safety measures that forced Metcalf to adopt practices that were less safe than the planned method, such as storing lumber on areas of roofs lacking sound structural support.  Pl. PT Br. at 146-47 (citing TR 585-86 (Chun)).  Moreover, the Navy's assessment of Metcalf was not substantiated by an April 2005 safety inspection conducted by the Hawaii Office of Safety and Health, and therefore does not diminish Metcalf's prior documented safety record.  PX 251

The Government responds that Metcalf does not contest that the Navy correctly cited Metcalf with safety violations, only that the violations were "minor" and required Metcalf to investigate the citations, diverting Metcalf from its work.  Gov't PT Br. at 57.

### iii.      The Court's Resolution.

For these reasons, the court has determined that actions taken by the Navy to ensure strict adherence with safety requirements, no matter how inconvenient or burdensome to Metcalf, were not a violation of any contractual provisions nor a breach of the duty of good faith and fair dealing.

### i.      The Navy "Actively Interfer[ed] With Metcalf's Efforts To Complete And Turn Over Housing Units." (First Am. Compl. ¶ 88).

### i.      Relevant Facts.

The RFP required Metcalf to establish and maintain a Quality Control ("QC") program that included "three phases of control" for each "definable feature of work."  JX A1 at DEF0498555; *see also id.* at DEF0498560 (defining the three phases of control as the "preparatory" phase, the "initial phase," and the "follow-up phase").

### ii.      The Parties' Arguments.

Metcalf interprets "definable feature of work" to mean a task within the project, *e.g.*, concrete or framing, and anticipated a total of twenty-five definable features of work.  Pl. PT Br. at 148 (citing TR 1357 (Oellien); PX 77); *see* JX A1, ¶ 3C.9 at DEF0498560).  During the 212 Project, however, Metcalf wound up conducting "hundreds" of preparatory meetings because "the [Navy's] view was that any scheduled activity was a definable feature of work."  TR at 1358 (Oellien).  These repeated preparatory meetings, with their often simple, idiosyncratic tasks, were unnecessary and greatly interrupted and delayed Metcalf's progress.  TR 1360-61 (Oellien).

The Government responds that the number of meetings required by the Navy to implement and revise construction was attributed to a misunderstanding of the definition of "definable feature of work" and was dependent on Metcalf's scheduling decisions.  Gov't PT Br. at 57-58.

### iii.        The Court's Resolution.

The Contract defines "a definable feature of work" as "a task which is separate and distinct from other tasks, [and] has the same control requirements and work crews.  The list of definable features of work shall include but not be limited to all critical path activities."  JX A1 at DEF0498558.  As the Government noted, Metcalf established the critical path of the 212 Project.  As such, Metcalf is in no position to complain about the consequences that followed.

For these reasons, the court has determined that the fact that Metcalf was required to attend more meetings than it planned is neither a violation of the Contract nor a breach of the Navy's duty of good faith and fair dealing.

### D.        First Amended Complaint Count II Alleged A Breach of Contract Based On "Constructive Change."

Metcalf's November 10, 2009 First Amended Complaint also alleges that the Navy's "delays, disruptions, and interferences on the [212] Project . . . constructively changed the Contract," for which the Navy is liable, pursuant to the Changes and Differing Site Conditions clauses, FAR 52.236-2, 52.243-4, "in the amount of $10,323,007, and an extension of the Contact completion date . . . ."  First Am. Compl. ¶ 131.

A "constructive change" occurs where a "the [Government] constructively alter[s] the contract, either expressly or implicitly, by requiring performance at variance with that set forth in the contract."  *Ace Constructors, Inc.* v. *United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007); *see also Int'l Data Products Corp.* v. *United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) ("A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government.").

This inquiry requires the trial court to examine the contract language to ascertain the contractual requirements.  *See Aydin Corp.* v. *Widnall*, 61 F.3d 1571, 1577 (Fed. Cir. 1995) ("To identify a constructive change, this court consults the contract language.").  Here, Metcalf alleged that the Navy constructively changed the contract based on: the different soil conditions (First Am. Compl. ¶ 115); "interferences, disruptions, and delays for which the Navy is responsible" (First Am. Compl. ¶¶ 116-18, 120, 122);[38] and "improperly t[aking] credit for Metcalf's installation of roofing tiles without wood battens and for alleged landscape deficiencies."  First Am. Compl. ¶ 119.

_____

[38] Specifically, the CO's failure to take timely action (First Am. Compl. ¶ 117), the requirement to use Primavera software (First Am. Compl. ¶ 118), the need to deal with expansive and chlordane-contaminated soils (First Am. Compl. ¶ 118), and the existence of soil stockpiles on the project site.  First Am. Compl. ¶ 122.

It follows from the prior analysis of the Contract that Metcalf's claim for "Constructive Change" must fail.  The court has determined that Navy's requirement that Metcalf use Primavera software was a contractual requirement and that the expansive soil situation and chlordane contamination did not constitute changed site conditions.  This leaves Metcalf's claims that the Navy's failure to timely investigate Metcalf's changed site conditions request constituted a constructive change.  The court, however, has determined that Metcalf is entitled to a 306-day extension, as a result of the Navy's breach of FAR 52.236-2(b).  Therefore, Metcalf's constructive change claim as to these issues is now moot.

The court has found that the Navy clearly established that the unilateral modification A00024 to credit the Navy for $399,722 for roof battens (JX A1 at DEF 0498602; JX E27 at DEF0064701-02; TR 1897-98, 1902 (Peralta)) and "landscape deficiencies" (DX 2907-08, 2598; TR 1972-84 (Flach), 1989-1994 (Steadman-Murphy), 2260-2281 (Yuan)) was justified and reasonable.  For these reasons, the court has determined that the Amendment A00024 did not constitute a constructive change.

**E.**     **The Second Amended Complaint Count II Alleged A "Breach [of Contract, Based On] Cardinal Change."  Sec. Am. Compl. ¶¶ 111-34.**

Assuming *arguendo* that, the court were to grant Metcalf's May 17, 2010 Motion to file the Second Amended Complaint, Metcalf still would not prevail on the merits of Count II ("Breach of Contract/Cardinal Change").  As a matter of law, a cardinal change arises only when "the *Government effects a change* in the work *so drastic* that it effectively *requires the contractor to perform duties materially different* from those in the original bargain."  *Int'l Data Prods.*, 492 F.3d at 1325 (Fed. Cir. 2007) (emphasis added); *see also Krygoski Constr. Co., Inc.* v. *United States*, 94 F.3d 1537, 1543 (Fed. Cir. 1996) ("[A] 'cardinal change' is a drastic modification beyond the scope of the contract[.]").  The underlying rationale of a cardinal change claim is "'to provide a breach remedy for contractors who are directed by the [G]overnment to perform work which is not within the general scope of the contract' and exceeds the scope of the contract's change clause."  *PCL Const. Servs., Inc.* v. *United States*, 47 Fed. Cl. 745, 804 (2000) (quoting *General Dynamics Corp.* v. *United States*, 585 F.2d 457, 462 (Ct. Cl. 1978)).  A cardinal change, however, does not arise if "[t]he contract itself explicitly provide[s] that discrepancies, omissions, conflicts and design changes would, or likely, would arise, and that the parties would address such issues during contract performance."  *Id*. at 805.

It is well established that "[e]ach [cardinal change] case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole."  *Wunderlich Contracting Co.* v. *United States*, 351 F.2d 956, 966 (Ct. Cl. 1965).  For example, where the contractor is asked to build the same building that was initially contracted for, there is typically no cardinal change.  *Id.* ("Plaintiff contracted to build a reinforced concrete hospital building on a certain site at Fort Howard, Maryland, and that is exactly what it built.  The hospital, when it was completed, was in the same location, looked the same, had the same number of rooms and floors and the same facilities as the one shown on the original plans and specifications."); *see also PCL Const. Servs.* v. *United States*, 47 Fed. Cl. 745, 805 (determining no cardinal change

where there was no "dramatic change in the use and function of the building or the size of the building"). If, however, "*drastic consequences follow* from *defective specifications*" a cardinal change may occur. *See Edward R. Marden Corp.* v. *United States*, 442 F.2d 364, 369-70 (Ct. Cl. 1971) (emphasis added) (holding that the Navy's change in specifications caused "major reconstruction" and "increased costs of almost double the contract price" thus resulting in a cardinal change).

In this case, Metcalf acknowledged that the cardinal change claim is no different from the "different site condition" claim:

> METCALF'S COUNSEL:     Your Honor, we didn't raise a new claim. *All we did was raise a new theory of recovery based upon the same factual circumstances that have existed since day one in our complaint.* It would be no different than arguing a different site condition claim[.]

TR 2623 (emphasis added).

Moreover, since the Contract incorporated the differing site condition clause, 48 C.F.R. § 52.236-2,[39] as a matter of law, Metcalf is precluded from pursuing a cardinal change claim, since Metcalf agreed to the contractual remedy afforded by an equitable adjustment. JX A1 at DEF0498429. *See Allied Materials & Equipment Co.* v. *United States*, 569 F.2d 562, 564 (Ct. Cl. 1978) ("[A] cardinal change is so profound that it is not redressable under the contract, and thus renders the [G]overnment in breach.") (*per curiam*).

Metcalf also appears to argue that, since the Contract provided that the Navy had to review and approve Metcalf's final plans and specifications, after such approval the Navy assumed liability for any changes that were inconsistent with or varied from what was approved. Metcalf, however, has failed to establish how the Navy's approval of Metcalf's construction plans made the Navy responsible for all costs associated with the expansive soils and chlordane situations. Moreover, Metcalf has cited no authority holding that the Government's careful monitoring of a design-builder's activities constitutes a cardinal change. Pl. PT Br. at 174-75.[40]

---

[39] FAR 52.236-2 provides, if:

> conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

48 C.F.R. § 52.236-2.

[40] Metcalf cites to *Hughes-Groesch Constr. Corp.*, 00-1 BCA ¶ 30912, which held that the conversion of a design-bid-build contract into a design-build contract was a cardinal change because the conversion "placed the entire redesign responsibility" on a contractor "no

For these reasons, the court has determined that Metcalf has not established that the Navy's actions effected a cardinal change.

### F.       The Government's Counterclaims.

The Government's November 30, 2009 Answer to Metcalf's November 11, 2009 First Amended Complaint asserts counterclaims for $3,570,480 in liquidated damages as a result of the late final turnover of the 212 Project, calculated at $290 per unit per calendar day.[41] Gov't 11/30/09 Answer at 18-19.  Since the Navy has retained $896,973 of that amount, the Navy claims that Metcalf is required under the Contract to pay the Navy the $2,673,507 balance due, plus interest, costs, and attorney fees.  Gov't 11/30/09 Answer at 19-20.

### 1.       The Navy Correctly Determined The Date Of Completion.

The Contract provides that if Metcalf "fails to complete the work within the time specified [therein], the Contractor shall pay liquidated damages to the [Navy] in the amount of $290 per unit per calendar day not completed for each day of delay for the Base Item and all Option work."  JX A1 at DEF0498371.  The Government argues that completion is the date of final turnover.  Gov't Br. at 62-63.  Metcalf argues that completion is the date of "substantial completion."  Pl. PT Br. at 160.

The United States Court of Appeals for the Federal Circuit held in *Kinetic Builders, Inc.* v. *Peters*, 226 F.3d 1307 (Fed. Cir. 2000):

> A project should be *considered substantially* completed when it is capable of being used for its intended purpose.  In determining whether the project is capable of being used for its intended purpose, it is necessary to consider the specific provisions laid out in the contract. . . . Thus, it is first necessary to identify the contract provisions defining the *parties' expectations* as to the owner's reasonable use of its facility.

*Id*. at 1315 (emphasis added) (internal citations omitted).

---

particularly equipped to accomplish such an assignment."  *Id*.  There is no evidence in this record that the Navy required Metcalf to undertake any work that was outside Metcalf's ability or expertise in "design-build" contracting.  TR 1423-24 (CEO Metcalf testifying that his business was the largest non-union contractor in the State of Hawaii).

[41]       RFP paragraph 1D.2(a),  "LIQUIDATED DAMAGES-CONSTRUCTION (SEP 2000) FAR 52.211-12," provides:

> (a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $290 per unit per calendar day not completed for each day of delay for the Base Item and all Option work.

JX A1 at DEF0498371.

In this case, the Contract provides that the Navy will "accept" housing units in the 212 Project upon the completion of five requirements, including "[l]andscaping for completed units must be established."  JX A1, 1D.1.b at DEF0498370.  The record establishes that landscaping remained an unresolved issue as of January 25, 2006.  PX 367. The record also establishes that the Navy determined that the "final acceptance" date of all the 212 Project units was October 17, 2006.  DX 0559.

The Board of Contract Appeals decisions have found "substantial completion" where a high percentage of the work is completed, such as where any minor punch-list items remain, and the project is available for its intended use.  *See Blinderman Constr. Co.* v. *United States*, 39 Fed. Cl. 529, 573 & n.40 (1997); *see also* JOHN CIBINIC JR. & RALPH C. NASH JR., ADMINISTRATIVE CONTRACTS 1061-62 (3d ed. 1995).  The governing precedent of our appellate court, however, takes a more strict approach favoring the customer:

> A finding of substantial completion is *only proper* where a promisee has obtained, for all intents and purposes, *all* the benefits it reasonably anticipated receiving under the contract.

*Kinetic Builders*, 226 F.3d at 1315-16.

Accordingly, the court has determined that "completion" in the context of the Contract required Metcalf to perform to the Navy's acceptance standards all requirements, including landscaping.  JX A1, 1D.1.b at DEF0498370.

Metcalf responds that it is entitled to two additional extensions.  The United States Court of Appeals for the Federal Circuit held in *Sauer Inc.* v. *Danzig*, 224 F.3d 1340, 1347 (Fed. Cir. 2000), that "a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled."

### 2.   Metcalf Is Entitled To An Extension For Excusable Delay Regarding The Notice To Proceed.

Metcalf argues that it is entitled to a thirty-day extension in connection with the Notice to Proceed, because the January 29, 2003 Modification P0001 (*see* JX E1, effective January 21, 2003, requiring Metcalf to complete the project on April 16, 2005, instead of March 5, 2005) "was signed under duress and/or mutual mistake."  Pl. PT Br. at 163.

The Amended RFP provides that the Contractor "shall be required to commence work . . . within 15 calendar days after the date the Contractor receives the notice to proceed, prosecute the work diligently and complete the entire work ready for use not later than 835 calendar days after the notice to proceed for Line Item 0001."  JX B13 at DEF0063510, ¶1D.1  In addition, the RFP also states that a "Notice To Proceed" will be deemed to have been issued 30 calendar days after the contract award date, eliminating the need for formal written notice.  JX A1 at DEF0498370, ¶ 1D.1.a(a).

On October 22, 2002, the Navy awarded Metcalf a contract to build the 212 Project. However, on November 19, 2002, prior to the contractually determined NTP date of November 21, 2002, Metcalf was instructed to "suspend any action" pending disposition of a bid protest filed by another firm. PX 55. On December 31, 2002, the Navy instructed Metcalf "to continue contract performance," but listed December 31, 2002, as the NTP and the contract completion date as April 16, 2005. PX 58; PX 63. On January 29, 2003, the Navy issued Contract Modification P0001, establishing April 16, 2005, as the completion date. JX E1 at DEF0064202.

The court construes the November 19, 2002 suspension as an instruction by the Navy that cancelled the NTP and nullified the completion date, pending further notice. The December 31, 2002 Navy letter to "continue performance" had no independent legal significance; rather, the Navy was required to issue a Modification of Contract in order to cause Metcalf to commence performance.

The January 29, 2003 Modification P0001, however, does not evidence that the Modification was supported by additional consideration. JX E1. Consequently, Metcalf is entitled to treat the January 29, 2003 Modification as if it were the effective date of the Contract and the Notice to Proceed as thirty days thereafter, *i.e.*, February 28, 2003, with March 14, 2003, as the date work must commence and 835 days thereafter as the *i.e.*, June 27, 2005 as the date of completion.

For these reasons, the court has determined that Metcalf is entitled to a 73 day extension with respect to the Navy's decision to change the Notice To Proceed.

### 3. Metcalf Is Not Entitled To An Extension For Excusable Delay For Removing Stockpile Materials With Chlordane.

Metcalf also argues that it is entitled to an extension relating to the additional delays requiring Metcalf to remove stockpile materials with chlordane. Pl. PT Br. at 164-65. Citing the report of Mr. Stynchcomb, it appears, although it is not certain, that Metcalf is seeking the difference between Metcalf's "critical path" acceptance date of February 22, 2007 and the Navy's acceptance of the project on March 2, 2007. PX 79 at 24-25.

The Government responds that Metcalf's "delay analysis" is unreliable. Gov't PT Br. at 64 (citing Weathers at 43).

The court has determined that Metcalf has failed to establish, even by a preponderance of evidence, entitlement to any additional extensions associated with the chlordane situation.

## IV. CONCLUSION.

For the reasons discussed herein, the court has determined that Plaintiff has failed to establish liability under all claims alleged, but is entitled to a 306-day extension caused by the

Navy's violation of FAR 52.236-2,[42] regarding the expansive soil condition, and an additional 73 days caused by the Navy's decision to change the Notice To Proceed.

The court intends to convene a conference with counsel, client representatives, and any institutional parties that may have a financial interest in this case, to discuss a final disposition at a convenient time during the week of December 19, 2011. *See Servidone Construction Corp.* v. *United States*, 931 F.2d 860, 861-62 (Fed. Cir. 1991) (affirming the trial court's use of a "modified" total cost method to determine the amount due for an equitable adjustment).

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

---

[42] The record in *Hedin* reflected that the relevant CO recognized that the agency's failure to investigate notice of sewer problems for a year resulted in a 120 day delay. *See Hedin*, 347 F.2d at 253 n.7. On that basis, the appellate court made a "finding" that the agency-caused delay was 120 days. *Id.* at 253. In this case, the Navy failed to introduce evidence or proffer an opinion regarding the amount of time that would be reasonable to conduct an investigation of Metcalf's June 24, 2003 differing site condition notice. Without any basis to determine this period, the court has no ability to make an appropriate offset against the entire 306 day period in which it took the Navy to act. An alternative remedy for this FAR violation may be more appropriate.

It appears that on August 5, 2004, the date that the Navy finally denied Metcalf's notice of a differing site condition, Metcalf was approximately 200 days behind schedule. PX 779 at 17 (Stynchcomb). This delay and effort to catch up resulted in Metcalf addressing the expansive soil situation by using a post-tension slab design that imposed significant costs on Metcalf, but were of greater benefit to the Navy than the plain concrete slabs typically used, such as those used in the Hunt Project that eventually had to be replaced. *See Hedin*, 347 F.2d at 253 (holding that "the government will have to respond in damages for the resulting additional costs which the plaintiff encountered.").

**COURT EXHIBIT A**

**Metcalf's Witnesses**
(In order of appearance)


     **Ms. Donna Mariko Matsuura** was a civilian Contract Specialist with NAVFAC Pacific and the CO who administered the 212 Project from the time it was awarded to Metcalf until March 2005.  TR 94-95; *see also* TR 96-219.  After conducting an examination of Ms. Matsuura (TR 117-36), the court has determined that she did not have the training or background to function as a CO and her role in administering the 212 Project appeared limited to be communicating performance decisions made by other construction management personnel ("CME").

     **Mr. Dee Kimura** was a civilian Project Design Engineer with NAVFAC Pacific Naval Facilities Engineering Command Pacific.  TR 221, 225.  He was involved with Site Engineering Investigation, including the soil engineer's report, preparation of the Request for Proposal ("RFP"), and ensuring that the design was performed per the requirements.  TR 224-25; *see also* TR 226-312.

     **LCDR Lance Alvin Lee** was a 1994 graduate of the University of Texas at Austin, where he received a B.S. in Chemical Engineering; the Navy's Officer Candidate School, and Civil Engineer Corps; and the Naval Post Graduate School, where he received a Master's of Science in Financial Management.  TR 322-24.  He served as the Resident Officer In Charge of Construction ("ROICC") at the Marine Corps Base in Kanoeke Bay, Hawaii from the summer of 2004 to the summer of 2006.  TR 324; *see also* TR 325-493.

     **Mr. Walter Y.T. Chun** obtained a B.S. in Safety and Health Engineering and Masters and PhD degrees from the Columbia Southern University.  TR 499-500.  In 2003, Mr. Chun was employed by Metcalf and later became the Senior Manager of the 212 Project.  TR 504-05.  Subsequently, he held numerous positions of responsibility for Metcalf.  TR 506-509; *see also* TR 510-959.

     **Mr. Geoffrey Dozier** was employed as a civilian Building Maintenance Inspector by the Marine Corps Family Housing Department, Kanoeke Bay from 1986-2007.  TR 962-63; *see also* 964-993.

     **Mr. Sam White** was President of SWI Finishing Corp. in Kerryville, Texas ("SWI").  TR 996.  SWI was a subcontractor that provided Metcalf with interior painting and exterior installation finish work on the 212 Project.  TR 997-1018.

     **Mr. Robin Lim** was Vice President of Geolabs, a geotechnical and engineering firm that specializes in design and construction.  TR 1021-22.  Mr. Lim has a B.S. in Mining Engineering and a Masters of Science in Geotechnical Engineering from the University of California at Berkeley.  TR 1022-23.  In early 2003, Metcalf Constriction hired Geolabs to drill site borings, obtain samples, perform laboratory testing, evaluate the results, and provide recommendations.  TR 1034-61.

**Mr. Michael Fattorsi** was hired by Metcalf in October 2006 to "close out" the 212 Project by obtaining a satisfactory final inspection from the Navy.  TR 1163-64; *see also* 1165-72.

**Mr. Nickolas ("Nick") Florez** has a B.S. in Civil Engineering from the University of Arizona and a MS in Civil Engineering from the University of Texas.  TR 1180.  He also joined the Navy, attended Officer Candidate School, and subsequently became a CO for the Marine Corps.  TR 1181.  Mr. Florez worked for Metcalf as a Consultant Project Manager on the Kaneohe Bay Project from late February 2004-mid-July 2004, during the period when the issue of expansive soils and required compaction rate arose.  TR 1184-89; *see also* TR 1190.[1]  At the time Mr. Florez ended his work for Metcalf, the Navy had not issued a change order for work on the production pads.  TR 1234.  Subsequently, he worked for a private contractor, and then his Navy Reserve unit was activated to Iraq, where he served as a CO, and then worked for the Army Corps of Engineers, with a warrant for both armed services.  TR 1184-85; *see also* TR 1187-1277.

**Mr. Alfred Hau Ling Cheng** is the Oahu Regional Manager for Goodfellow Brothers, Inc., a firm that does heavy civil site work.  TR 1278-81.  In November 2004, Goodfellow was hired as a subcontractor by Metcalf to perform site work at the Kaneohe Bay project.  TR 1284-1305.

**Mr. Roger Eldon Schenk** was the owner of Precision Electric that was hired as a subcontractor by Metcalf to provide underground meter base and street lighting for the Kaneohe Bay Project.  TR 1306-07; *see also* TR 1308-26.

**Mr. James William Oellien** is the principal of Oellien Pacific, a design build construction contractor.  TR 1334-36.  From 2003-2006, Mr. Oellien served as a Project Superintendent and later as a Project Manager for Metcalf on the Kaneohe Bay Project.  TR 1337; *see also* TR 1338-1418.

**Mr. Terry Ken Metcalf,** CEO and President of Metcalf, has worked in the construction business since at least 1975.  TR 1338-1418, 1421.  Metcalf commenced business in Hawaii in 1985.  TR 1421.  By 1990, Metcalf was reorganized as the "largest neighbor island general contractor."  TR 1423.  Sometime in 2000-2001, Metcalf qualified as a certified HUB Zone contractor, TR 1423-24, and on May 24, 2001, bid on the Navy project.  PX 47.  Thereafter, Mr. Metcalf remained as the principal for the company on the Kaneohe Bay Project.  TR 1424-1523.

**Mr. Paul L. Stynchomb** is a Senior Managing Director in the Construction Solutions practice at FTI Consulting, Inc. and was retained as an expert witness regarding costs and delays regarding the Navy's administration of the October 22, 2002 Contract.  PX 779; *see also* TR 2008-2110 (Cross Examination); TR 2110-2125 (Re-Direct).

---

[1] At the request of Metcalf's counsel, TR 1204-1210 was placed under seal, without objection by the Government.  Heritage Reporting, however, placed the entire January 25, 2010 transcript under seal.  TR 1178-1493.

**Mr. Matt Krafft** is a Senior Managing Director at FTI Consulting, Inc. and an expert witness regarding total costs.  PX 778; *see also* TR 2132-2236 (Cross Examination); TR 2236-2246 (Re-Direct).

**Captain William Grip** currently is a Command Engineer assigned to the North American Aerospace Defense Command and U.S. Northern Command.  TR 2466.  In June 2005, he was assigned as the Executive Officer for the Kaneohe Bay Marine Corps Base reporting to NAVPAC PAC.  TR 2473-76.  In that capacity, he was responsible for providing leadership on the 212 Project as to issues of quality, safety, and timeliness.  TR 2475-77, 2480; *see also* 2481-2615.

**COURT EXHIBIT B**

**The Government's Witnesses**
(In order of appearance)


      **Mr. William Robert Gallagher Borengasser** currently is Acting Capital Improvements Product Line Coordinator and the Deputy ROICC, *i.e.*, the civilian counterpart to the ROICC at Kaneohe Bay.  TR 1527-28, 1232.  Mr. Borengasser graduated from the University of Hawaii and received a degree in civil engineering in 1994.  TR 1528.  Subsequently, he became a professional licensed Civil Engineer and was hired as a Construction Management Engineer by the NAVFAC in 2000 and assigned to the Kaneohe Marine Corp base.  TR 1528-31; *see also* TR 1532-1647.

      **Mr. Mark Quohian Wong** graduated in 1994 from Santa Clara University with a B.S. in Civil Engineering.  TR 1648.  He also is a licensed professional engineer and a certified member of the Defense Acquisition Work Force Initiative Act.  TR 1648-49.  Mr. Wong began to work for the Navy in the ROICC at the Marine Corps Base Hawaii in 1998.  TR 1657.  From April 2004-May 2005, he was the construction management engineer on the 212 Project, succeeding Mr. Borengasser.  TR 1652-53; *see also* TR 1654-1755.

      **Mr. Shenghai "Karl" Cheng** is a graduate of the National Taiwan University and the University of California at Berkeley where he received a Masters degree in Geotechnical Engineering.  TR 1763-64.  He has a Hawaii professional engineering license in civil engineering and a California civil engineering and geotechnical engineer license.  TR 1763.  In late 1984, he became employed by the Navy ROICC at Kaneohe as a construction management engineer.  TR 1765.  From approximately 1983 to late 1984, Mr. Cheng worked for GeoLabs.  TR 1765-66; *see also* TR 1767-76, 1784-808.

      **Mr. Paul Seiji Morimoto** has a B.A. in History and a B.S. in Civil Engineering from the University of Hawaii.  TR 1810.  Mr. Morimoto began his career with Hirata & Associates in 1978 and currently is the President of that firm.  TR 1809-10.  Hirata & Associates was contracted by Danilo Lopez, as a Navy architect, and asked to conduct a preliminary soil investigation of the 212 project at Kaneohe Bay.  TR 1812; *see also* TR 1813-51.

      **Mr. Orlina R. Perlata** is a 1980 graduate of the University of Philippines with a B.S. in civil engineering.  TR 1852.  He is a licensed professional engineer in the Philippines and in Hawaii.  TR 1853.  In July 2004, he began work for the Navy ROICC in Kaneohe as a CME.  TR 1868.  In January 2006, Mr. Perlata took over from Mr. Clyde Suzuki as CME for the 212 housing project.  TR 1869-70; *see also* TR 1871-1969.

      **Mr. Matt M. Flach** received a B.S. from the University of Minnesota in 1984 and is licensed in California as a Landscape Architect.  TR 1969-70.  He has been employed by the Navy since 1987 and became involved with the 212 housing project at Kaneohe in February 2008.  TR 1970-71; *see also* TR 1972-84.

**Lt. Jennifer Ellen Steadman-Murphy** became the Resident Officer in Charge of Construction at Kaneohe Bay in September 2008 and presently serves in that position. TR 1985. Lt. Steadman-Murphy has a B.S. in Chemical Engineering from Texas A&M University and subsequently through the Officer Candidate School. TR 1985. She has a Defense Acquisition Work Force Certification through the Defense Acquisition University. TR 1985; *see also* TR 1986-99.

**Lt. Ning Lee Yuan** was assigned as the ROICC at Kaneohe Bay in August 2007, when the 212 Housing Project was in the process of being "closed out." TR 2257-58. Lt. Yuan has a B.S. in Chemical Engineering from the State University of New York at Buffalo, with a minor in Mathematics. TR 2254. He also is a licensed professional Civil Engineer in Hawaii. TR 2254-55; *see also* TR 2258-2306

**Mr. Stephen Weathers** is a founding shareholder and project manager at Capital Project Management, Inc., and was retained as an expert witness to evaluate Metcalf's claim and determine the cause of delay and evaluate damages that Metcalf asserted. DX 2934A; *see also* TR 2436 (Cross Examination), 2437-2453 (Re-Direct).

## COURT EXHIBIT C

| Exhibit No. | Amend # | Effective Date | Deadline Extended | Price Modification | Nature of Modification(s) | Accord and Satisfaction Clause** |
|---|---|---|---|---|---|---|
| JX E1 | P00001 | 1/21/2003 to 4/16/2005 | | -- | Extension of time (no reason provided). | No |
| JX E2 | P00002 | 2/13/2003 | -- | $5,399,000 | Exercises option 0001 (to build additional units). | No, but not at issue. |
| JX E3 | P00003 | 2/13/2003 | -- | -- | Administrative correction to Mod. P00002 to correct accounting designations. | No, but not at issue. |
| JX E4 | A00001 | 10/22/2002 | -- | -- | Incorporates recent Hawaii wage law decision; changes contract number. | No, but not at issue. |
| JX E5 | A00002 | 3/16/2004 | -- | $38,436 | Engage in partnering session; additional ductwork and telecom work. | Yes. |
| JX E6 | A00003 | 6/8/2004 to 5/7/2005 | | $585,565 | Design and relocation of circuitry/electronical systems. | Yes. |
| JX E7 | A00004 | 7/24/2004* | -- | $25,506 | Additional partnering session; removal and disposal of unforessen piping. | Yes. |
| JX E8 | A00005 | 7/24/2004 | -- | -- | Administrative revision of accounting and appropriation data. | No, but not at issue. |
| JX E9 | A00006 | 8/5/2004 | -- | $14,081 | Labor and equipment for additional soil testing. | Yes. |
| JX E10 | A00007 | 8/17/2004 to 05/12/2005 | | $56,640 | Removal of two feet of soil beneath protoype building, and installation of fill structures. | Yes. |
| JX E11 | A00008 | 10/20/2004* | -- | $36,432 | Removal of tree and debris; installation of solar heater timers; change of tile; circuitry modifications. | Yes. |
| JX E12 | A00009 | 9/21/2005 | -- | -- | Administrative modification of Metcalf's address block. | No, but not at issue. |
| JX E13 | A00010 | 5/24/2005* | -- | $142,605 | Relocation of PRVs (sewage); disposal of excess non-contaminated soil. | Yes. |
| JX E14 | A00011 | 7/13/2005 to 06/06/2005 | | -- | Extension of time due to adverse weather. | Yes. |
| JX E15 | A00012 | 7/19/2005 to 07/25/2005 | | -- | Extension of time due to concrete strike. | Yes. |
| JX E16 | A00013 | 7/26/2005 to 10/10/2005 | | $94,826 | Changes to telecom boxes and cable routing in cooperation with Verizon. | No, but states "modification constitutes the full and complete equitable adjustment for the charged work" and not at issue. |
| JX E17 | A00014 | 10/20/2005* to 10/28/2005 | | $17,622 | Extends time to perform Mod. No. 00013. | Yes. |
| JX E18 | A00015 | 10/20/2006 | -- | -- | Administrative corrections to Mod. No. 00014 to correct math error. | No express accord clause, but Mod. No. A00015 modifieds Mod. No. A00014, which contains accord and satisfaction clause. |

| JX E19 | A00016 | 11/1/2005 to 12/30/2005 | $592,914 | Removal of chlordane-contaminate soil stockpiles. | **NO ACCORD.** Metcalf expressly disagreed with the equitable adjustment. |
| JX E20 | A00017 | 12/22/2005 -- | $10,000 | Requires use of contaminated soil stockpiles in project; modifies landscaping requirements; states that "Government has determine the area to be safe [with respect to Chlordane]." | **NO ACCORD.** Metcalf expressly disagreed with the equitable adjustment. |
| JX E21 | A00018 | 1/27/2006* -- | ($271,454) | Reduction in number of trees to be planted. | Yes. |
| JX E22 | A00019 | 2/10/2006* -- | $301,819 | Installation of soap dishes, electrical conduits; transport of 3400+ tons of topsoil; construction of concrete obstruction on road. | Yes. |
| JX E23 | A00020 | 3/31/2006 to 2/9/2006 | -- | Extension of time due to adverse weather. | Yes. |
| JX E24 | A00021 | 6/7/2006* to 3/8/2006 | $24,652 | Excavation of chlordane-contaminated area and use of soil elsewhere in project. | Yes. |
| JX E25 | A00022 | 6/20/2006* to 6/20/2006 | -- | Time extension  (no reason provided). | Yes, but notes that Metcalf continues to dispute Mod. Nos. A00016-00017. |
| JX E26 | A00023 | 9/20/2006 to 10/17/2006 | $527,176 | Transport and disposal of  3000 cubic yards contaminated soil; 4500 cubic yards other soil. | Yes. |
| JX E27 | A00024 | 9/26/2006 -- | ($399,772) | Credit for Metcalf's failure to install wood battens for roof tiles. | **NO ACCORD.** Metcalf expressly disagreed with the equitable adjustment. |
| JX E28 | A00025 | 9/24/2006* -- | $6,151 | Install potable water test port. | Yes. |
| JX E29 | A00026 | 4/5/2007 -- | $101,434 | Tranport of additional 160 truckloads of soils (further modifying Mod. Nos. 00016-00017). | **NO ACCORD.** Metcalf expressly disagreed with the equitable adjustment. |
| JX E30 | A00027 | 11/7/2007 -- | ($51,496) | Credits for walk-in closets, glass plates, cabinetry, stair risers, kitchen sink, air chambers.  Increase for removal of dead tree. | Yes |
| JX E31 | A00028 | 11/8/2007 -- | ($15,049) | Credit for deletion of work (restoration of two lay down areas). | **NO ACCORD.** Metcalf expressly disagreed with the equitable adjustment. |
| JX E32 | A00029 | 11/5/2008 -- | ($260,216) | Credit for Metcalf's failure to complete landscaping maintenance work, to construct irrigation system, and to provide as-built drawings in AutoCAD format. | **NO ACCORD.** Metcalf expressly disagreed with the equitable adjustment. |
| JX E33 | A00030 | 6/2/2009 -- | -- | Corrects administrative errors in data entry from Mod. No. 00029. | No, but not at issue. |
| JX E34 | A00031 | 8/19/2009 -- | -- | Corrects administrative errors in data entry from Mod. No. 00029. | No, but not at issue. |

* = No "effective date" listed.  Date the Modification was signed by Contracting Officer.

**ACCORD & SATISFACTION LANGUAGE: "As negotiated, the parties hereto mutually agree to the following contract prices as complete equitable adjustment for the following:" [Text of modifications follows].  "CONTRACTOR'S STATEMENT OF RELEASE: Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full both for time and money and for any and all costs, impact effect, and for delays and disrputions arising out of, or incidental to, the work as herein revised."

# **COURT EXHIBIT D**

## The Evolution Of Count 2 Of Metcalf's Complaint

| November 5, 2007 Complaint | | November 10, 2009 Amended Complaint | | May 17, 2010 Proposed Second Am. Compl. |
|---|---|---|---|---|

**November 5, 2007 Complaint**

Count 1
"Breach of Contract/Duty of Good Faith & Fair Dealing" (¶¶ 84-95).
Demand = $26,089,139

Count 2
"Delay and Impact Claim" (¶¶ 96-114)
Focus on "constructive change" theory (¶ 114), resulting from delays and interference (¶ ¶ 102-04, 106, 108-09), and from altered site conditions due to chlordane and expansive soil (¶ 101).
Demand = $17,250,124

*Materially identical.*

*Slight damages increase.*

*Claim 2, renamed but nearly identical.*

*Decreased damages.*

**November 10, 2009 Amended Complaint**

Count 1
"Breach of Contract/Duty of Good Faith & Fair Dealing" (¶¶ 95-110).
Demand = $27,913,829

Count 2
"Contract Claims" (¶¶ 111-31)
Focus on "constructive change" theory, (¶ 131), resulting from delays and interference, (¶ ¶ 116-17, 121-22), and from altered site conditions due to chlordane and expansive soil (¶ 115).  New allegation that 30 days should be added to completion date (¶ 123).
Demand = $10,323,007

*Identical.*

*Claim dropped.*

*New claim.*

*Damages substantially increased.*

**May 17, 2010 Proposed Second Am. Compl.**

Count 1
Breach of Contract/Duty of Good Faith & Fair Dealing (¶¶ 95-110).
Demand = $27,913,829

Contract/Delay claim dropped.

Count 2
"Breach [of Contract] /Cardinal Change" claim added (¶¶ 111-34).
Focus on Navy's refusal to approve new designs (¶¶ 116, 119-125), contaminated soil (¶¶ 126-131), and denial of differing site condition claim (¶115-17).
Demand = $27,913,829